**Mary LAUBACH, et al.**

**v.**

**FIDELITY CONSUMER DISCOUNT COMPANY, et al.**

Civ. A. No. 87–2026.

United States District Court,
E.D. Pennsylvania.

March 31, 1988.

David Searles, Eric Frank, Philadelphia, Pa., for plaintiffs.

Jeffrey S. Saltz, Philadelphia, Pa., for defendants.

## MEMORANDUM

NEWCOMER, District Judge.

I have before me cross motions for summary judgment in this action. For the reasons stated below, I grant plaintiffs' motion in part and I also grant defendants' motion.

### I. *Facts*

The complaint in this action seeks monetary damages for the plaintiffs pursuant to the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* (Count I); the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* (Count II); the Pennsylvania Usury Law, 41 P.S. § 101 *et seq.* (Count III); and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.* (Count IV). Plaintiffs seek summary judgment on liability on Counts II and III. Defendants seek summary judgment on Counts I, III and IV.

The facts in the case are as follows: Each of the following plaintiffs is a homeowner in the City of Philadelphia. The defendant has loaned each plaintiff money, secured by a mortgage, at annual percentage rates varying from 31.77% to 41.10%.

Plaintiff, Annabelle Smith (hereinafter "Smith") purchased the home at 1253 North 54th Street in 1955. In January of 1984 she borrowed money from defendant Fidelity Consumer Discount Company at an annual percentage rate of 36.57%. Ms.

Smith is 80 years old. Plaintiffs, Charles and Margaret Coplin ("the Coplins") are successors in interest to Mr. John Coplin (deceased) who purchased the home at 5537 Osage Avenue in 1957. In October of 1984 John Coplin borrowed money from defendant at an annual percentage rate of 41.10%. John Coplin was 71 years old at the time of the transaction. Plaintiff Gloria Young has owned the home at 5128 Chancellor Street since 1955. Plaintiff Tito Manor is Gloria Young's nephew. In July of 1986 plaintiff Manor borrowed money from Fidelity Consumer Discount Co. at an annual percentage rate of 33.62%. Plaintiff Young gave a mortgage and co-signed on the loan to plaintiff Manor.

Defendant Fidelity Consumer Discount Company ("Fidelity") is a Pennsylvania corporation engaged in the business of making home equity loans to the general public. Fidelity is a wholly owned subsidiary of an entity known as Equitable Credit and Discount Company. Defendant, Jerry Silver ("Silver") is an individual who is president and chief operating officer of Fidelity. Defendant, Marshall Gorson ("Gorson") is the majority stockholder of Equitable Credit and Discount Company which in turn owns 100% of the shares of Fidelity.

Because the facts of each particular plaintiff's case are important for the resolution of these motions, I will review them individually.

### A. Plaintiffs Charles and Margaret Coplin

Plaintiff Charles and Margaret Coplin are the son and daughter-in-law of John Coplin. In 1984, Mr. Coplin was a 75 year old retired widower. He resided at 5537 Osage Avenue, Philadelphia, in a home he purchased in 1957. His income was derived from Social Security and a pension from the City of Philadelphia. Mr. Coplin could neither read nor write. He was assisted in managing his financial affairs by an individual named Malvina Jackson.

On October 31, 1984, Mr. Coplin entered into a loan transaction with Fidelity.[1] The purpose of the loan was to finance the purchase of a used car from Paschall Auto. Included among the loan papers was a mortgage on Mr. Coplin's home.

There are two documents among those Mr. Coplin signed on October 31, 1984 which are of particular relevance. First, while he was in Fidelity's office, Mr. Coplin signed the reverse side of a check issued by Fidelity and payable to Mr. Coplin in the amount of $1,761.50. By signing that check, Mr. Coplin endorsed some of the loan proceeds to Paschall Auto. Second, Fidelity and Mr. Coplin signed a deed coveying his home to Fidelity's parent corporation, Equitable Credit and Discount Co. Fidelity had a practice of requiring its customers to sign a deed in its favor whenever the customer was too old to purchase life insurance. Fidelity also required Mr. Coplin to satisfy a number of obligations which were prior liens on his property. The cost to Mr. Coplin of doing so was as follows:

| | |
|---|---|
| 1983–84 delinquent real estate taxes | $ 521.14 |
| Germantown Savings Bank | 865.13 |
| Fleet Consumer Discount Co. | 362.09 |
| Central Credit | 1,681.14 |

In addition, Fidelity imposed a service charge of $1,072.00 in the transaction, a sum representing almost 20% of all the monies Fidelity claims to have advanced in connection with the loan.

Finally, to establish itself as the first lienholder on Mr. Coplin's home, Fidelity also required Mr. Coplin to pay filing fees totalling $91.00 in order to mark satisfied in the Department of Records many of the prior record liens on his home. Mr. Coplin even paid the filing fees for the satisfaction of two liens (held by Mid–Penn Consumer Discount Co. and Second Mutual Fund) which were not paid off with proceeds from Fidelity's loan but which had been previously paid by Mr. Coplin himself.

A property search conducted by Fidelity before granting the loan revealed 10 mortgages of record on Mr. Coplan's property in October, 1984. Five of the mortgages

---

**1.** A fact dispute exists as to how many times Mr. Coplin visited the car dealership to consummate the transaction.

were held by Fleet Consumer Discount Co. At least two of these mortgages were not satisfied of record in the Department of Records until March 12, 1985, more than four months after the loan transaction. Similarly, the mortgage held by Hudson United Bank was not marked satisfied of record until March 12, 1985. The mortgage held by Second National Fund was marked satisfied on November 19, 1984. The record does not reveal when or if the mortgages held by Germantown Savings Bank, Mid–Penn Consumer Discount Co. and Central Credit were marked satisfied.

John Coplin passed away in December 1985. Plaintiffs Charles and Margaret Coplin have succeeded to his interest and now own the property at 5537 Osage Avenue. On November 3, 1986, the plaintiffs exercised their right to rescind the October 31, 1984 loan transaction described above pursuant to TILA. Fidelity received notice of the rescission and has not since then terminated its security interest in the subject property. Rather, Fidelity is continuing to try to enforce its security interest in the property.

### B. *Plaintiff Annabelle Smith*

Plaintiff Smith, age 81, resides at 1253 North 54th Street, Philadelphia, PA in a home she owns in trust for her son, Herbert Smith. The home was originally purchased in 1955.

In December, 1983, Herbert Smith applied to Century Chevrolet for financing to purchase a used car. A Century salesman named Lee telephoned defendant Fidelity and provided information regarding Mr. Smith's finances, including information about Mr. Smith's ownership interest in the residence of his mother and that the house was clear of unpaid liens. Fidelity informed Century that it would not extend a loan to Mr. Smith unless his mother co-signed for the loan so that the loan would be secured by a mortgage.

Fidelity eventually approved the loan application for an approximate amount of $2,300.00, the cost of the car. A Fidelity salesman visited the Smiths at their home where they entered into a residential mortgage transaction. However, Mr. Smith cancelled the loan shortly thereafter because the car was not performing satisfactorily.

Mr. Leone from Fidelity then sent the Smiths' a letter stating that they now had a $7,500.00 "line of credit" they could use at any time. Actually, "line of credit" did not mean that the Smiths could draw the money as needed.

On January 27, 1984, the Smiths and Fidelity entered into a loan transaction in which Fidelity obtained a mortgage of $5,500.00 on Mrs. Smith's home. A property search Fidelity had ordered earlier had shown three mortgages on the property in favor of Commercial Banking Corporation, Second Consumer Discount Company and Troy Acceptance Corporation. Although these mortgages had been paid, they were never satisfied of record. In keeping with the company's policy on first lien loans, Fidelity had to satisfy these liens of record before it could make a loan to the Smiths.

Therefore, Fidelity included the sum of $39.00 for the Recorder of Deeds ($13.00 to satisfy each mortgage) in the loan to the Smiths. As set forth in the disclosure statement Fidelity included in the loan all the following charges:

| | |
|---|---|
| $ 11.00— | recording fee |
| $ 50.00— | document preparation fee |
| $ 10.00— | appraisal fee |
| $ 5.00— | credit report |
| $ 6.00— | search |
| $154.08— | credit life insurance |
| $ 39.00— | Recorder of Deeds |

In addition to giving the Smiths a check for $4,216.59, Fidelity, out of loan proceeds, paid the City $11.00 to record the mortgage. Several months later, Fidelity sent a $26.00 check to the City to satisfy the Commercial Banking and Second Consumer mortgages. Fidelity's loan folder for this transaction shows no other disbursements until foreclosure proceedings in July, 1985. Fidelity never did pay the $13.00 fee for satisfying the Troy Acceptance mortgage; nor did it return that amount to the Smiths.

In May, 1986, Mrs. Smith sent a notice to Fidelity rescinding the loan transaction. Fidelity received the notice on May 14, 1986

but has refused to terminate its security interest in Mrs. Smith's home.

In September, 1986, Fidelity commenced a foreclosure proceeding against Mrs. Smith.

### C. *Plaintiffs Gloria Young and Tito Manor*

Plaintiff Gloria Young ("Mrs. Young") is a 59 year old divorced woman who lives at 5128 Chancellor Street, Philadelphia. She first purchased the property in 1955 while still married to her ex-husband and she became the sole owner in connection with her divorce in 1961. Plaintiff Tito Manor ("Mr. Manor"), who is 23 years old, is Mrs. Young's nephew.

In early July 1986, Mr. Manor responded to an automobile advertisement placed in the Philadelphia Daily News by Samson Motors, Inc. ("Samson") which stated "no money down, no credit needed." He called and spoke with a salesman named Dave and told him he was interested in a 1979 or 1980 Oldsmobile. Mr. Manor then went to Samson's lot with his mother and stepfather. The salesman showed Mr. Manor a black and gold 1979 Oldsmobile which had a sign on the windshield stating "$46.00 per week, no money down." Mr. Manor paid a $10 deposit on that automobile and completed a credit application.

A few hours later, the salesman called Mr. Manor at home and told him that his credit had been approved. Two days later, and before Mr. Manor had returned to the lot to complete the deal, the salesman called back and told him that he would need a co-signer. Mr. Manor, who is a ROTC Marine, asked his sergeant to co-sign. His sergeant agreed, but he was rejected by Samson as a co-signor.

Mr. Manor then made arrangements for his aunt, Mrs. Young, to co-sign for him. The salesman took a credit application from her over the telephone. The credit information was telephoned to Fidelity by Samson. The salesman later called Mr. Manor and Mrs. Young back to say that the credit had gone through. He also stated that Mrs. Young should bring her deed with her to verify that she is a homeowner. He did not explain that her home would serve as security for the car loan.

On July 9, 1986, Mr. Manor and Mrs. Young went to Samson's lot. They were told that they would be taken to Fidelity "Bank." They were taken to Fidelity's office located on Castor Avenue by another Samson employee some time between 6 p.m. and 7 p.m. While at Fidelity's office, Mr. Manor learned that Samson intended to sell him a 1976 Oldsmobile instead of a 1979 Oldsmobile because he could not "afford" the later model car. He nevertheless decided to go through with the deal as he was very eager to have a car. The Fidelity representative explained that the cost of the car was $3,600. He told plaintiff what the monthly payments would be and that they should be made to Fidelity's West Chester Pike Office. He did not explain to plaintiffs what the interest rate or annual percentage rate was for the loan; he did not explain that there would be a mortgage on Mrs. Young's home; and he did not explain that there was a right to cancel the loan for three days. Mr. Manor felt that the Fidelity representative was rushing because of the lateness of the hour. Mr. Manor and Mrs. Young spent about one-half hour in Fidelity's office. In addition to signing various loan papers, they also both signed a check made out by Fidelity to them in the amount of $4,359.60. That check was then given to the Samson employee who had driven them to Fidelity. After leaving Fidelity's office, the Samson employee drove them back to Samson's lot. Mr. Manor then received the car keys and took the car with him that day.

In the loan transaction of July 9, 1986, Mrs. Young granted Fidelity a mortgage on her home. She and Mr. Manor also obliged themselves to pay a service charge of $544.44 on the loan. The annual percentage rate in the transaction was 33.617%. The loan is now the subject of mortgage foreclosure proceedings brought by Fidelity against Mrs. Young's home.

### II. *Discussion*

A trial court may enter summary judgment if, after a review of all evidentiary

material in the record, there is no genuine issue as to any material facts, and the moving party is entitled to judgment as a matter of law. *Bank of America Nat. Trust and Sav. Ass'n v. Hotel Rittenhouse Associates,* 595 F.Supp. 800 (E.D.Pa.1984). Where no reasonable resolution of the conflicting evidence and inferences therefrom could result in a judgment for the non-moving party, the moving party is entitled to summary judgment. *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 883 (3d Cir.1981), *cert. denied* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

The moving party must initially show an absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986). Once the moving party has pointed out the absence of a dispute as to a material fact, the non-moving party must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions or answers to interrogatories showing there is a genuine issue for trial. *Celotex,* at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

In this case, both parties have filed motions for summary judgment. Because I find that genuine issues of material fact do not exist in this case, summary judgment is appropriate.

### A. *Defendant's Summary Judgment Motion*

Defendants request the court to enter summary judgment in their favor and against the plaintiffs on all claims based on alleged usury violations, including counts I (RICO), III (state usury claims), and IV (Pennsylvania Unfair Trade Practices and consumer Protection Law). Defendants claim that Pennsylvania usury law does not apply to the loans in question because state law is preempted by section 501(a)(1) of the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C. § 1735f–7 note.

Section 501(a)(1) of the Deregulation Act exempts from state usury law any qualified loan by a qualified lender. Section 501(a)(1) provides:

The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is—

(A) secured by a first lien on residential real property, by a first lien on all stock allocated to a dwelling until in a residential cooperative housing corporation or by a first lien on a residential manufactured home;

(B) made after March 31, 1980; and

(C) described in section 527(b) of the National Housing Act (12 U.S.C. 1735f–5(b)), except that for the purpose of this section—

(i) the limitation described in section 527(b)(1) of such Act that the property must be designed principally for the occupancy of from one to four families shall not apply. . . .

12 U.S.C. § 1735f–7 note.

As section 501(a)(1)(C) makes reference to section 527(b) of the National Housing Act, 12 U.S.C. 1735f–5(b), that provision must be consulted as well. Section 527(b) of the National Housing Act provides in pertinent part:

[T]he term "federally related mortgage loan" means any loan which—

(1) is secured by residential real property designed principally for the occupancy of from one to four families; and

(2) . . . .

(D) is made in whole or in part by any "creditor," as defined in section 103(f) of the Consumer Credit Protection Act of 1968 (15 U.S.C. 1602(f)), who makes or invests in residential real estate loans aggregating more than $1,000,000 per year.

12 U.S.C. § 1735f–5(b).

Since section 527(b)(2)(D) refers to the definition of "creditor" in section 103(f) of

the Consumer Credit Protection Act of 1968, 15 U.S.C. § 1602(f), that provision must also be reviewed. Section 103(f) provides in pertinent part:

> The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. . . .

15 U.S.C. § 1602(f).

▆ The undisputed evidence demonstrates that each of the three requirements for federal preemption of state usury law under Deregulation Act § 501(a)(1) is satisfied in this case. To begin with, requirement (B) is indisputably satisfied. All parties agree that these loans were made after March 31, 1980. Further, requirement (C) is also satisfied. The Affidavit of Paul Castignani establishes that Fidelity was, at the time of the loans, a creditor who made residential real estate loans aggregating more than $1,000,000 per year. Indeed, Fidelity's first mortgage loans alone aggregated more than $1,000,000 for the years in question, and its total residential mortgage loans aggregated more than $3,000,000 per year.

Therefore, the pertinent question is whether the loans satisfied requirement (A), providing that the loans be secured by a first lien on residential real property. The facts demonstrate that each of the three residential mortgages obtained by Fidelity as security for its loans was a first lien on residential real property. In each case, any prior liens on the property were either previously paid off or were fully paid off from the proceeds of Fidelity's loan.

Plaintiffs contend that the exemption from state usury law applies only to loans taken for the purpose of purchasing the mortgaged residential property.[2] There is nothing in the language of the statute that would limit the exempted loans to purchase money mortgages. Section 501(a)(1)(A) refers merely to a loan "secured by a first lien on residential real property," without any qualification that the proceeds of the loan be used to purchase the residential real property. Similarly, section 527(b)(1) of the National Housing Act, incorporated by reference in section 501(a)(1)(C) of the Deregulation Act, refers simply to a loan "secured by residential real property," again without any limitation regarding purchase money.

Plaintiffs' attempt to limit the reach of section 501(a)(1) to purchase money mortgages is further precluded by regulations and interpretations adopted by the Federal Home Loan Bank Board, pursuant to section 501(f) of the Deregulation Act, which authorizes the Board "to issue rules and regulations and to publish interpretations governing the implementation of this section." Such regulations and interpretations, while not binding, are entitled to deference. *See, e.g., Bank of New York v. Hoyt,* 617 F.Supp. 1304, 1313–14 (D.R.I. 1985). Under this authority, the Board has issued a regulation defining the scope of a first lien as follows:

> "Loans which are secured by first liens on real estate" means loans on the security of any instrument (whether a mortgage, deed of trust, or land contract) which makes the interest in real estate . . . specific security for the payment of the obligation secured by the instrument: *Provided,* that the instrument is of such a nature that, in the event of default, the real estate described in the instrument could be subjected to the satisfaction of

---

2. The cases plaintiffs cite are clearly distinguishable. *Mitchell v. Trustees of U.S. Mut. Real Estate Inv. Trust,* 144 Mich.App. 302, 375 N.W.2d 424 (1985) involved a "wraparound mortgage" which was a second mortgage. *Mitchell* did not involve a prior loan entirely satisfied by the debtor. The court in *In re Russel,* 72 B.R. 855 (Bankr.E.D.Pa.1987) did not reach this specific issue because it found the defendant failed to establish another factor in the Deregulation Act test.

the obligation with the same priority as a first mortgage or a first deed of trust in the jurisdiction where the real estate is located.

12 C.F.R. § 509.2(c). Nothing in this regulation requires a "first lien" to be a purchase money mortgage in order to qualify for the federal exemption from state usury law. The statutory language and the Federal Home Loan Bank Board regulations support the finding that section 501(a)(1) is not limited to purchase money loans. The mortgages provided to Fidelity plainly fall within the regulation defining first liens. 12 C.F.R. § 590.2. In the event of a default on the loan, Fidelity's interest in the mortgaged real estate would be in first position, prior to any other creditors of the mortgagor. The former creditors who had previously recorded mortgages against the real estate could not be considered "prior" to Fidelity, because *no money was owed to them.* The undisputed facts show that the former creditors were fully paid off either before Fidelity's loan or in connection with the distribution of the proceeds of Fidelity's loan.

Plaintiffs' argument is also inconsistent with an official interpretation of the statute issued by the Federal Home Loan Bank Board, pursuant to section 501(f) of the Deregulation Act. The Board has ruled that a new mortgage may qualify as a first lien loan under section 501(a)(1), where its proceeds are used to pay off a loan secured by a prior recorded mortgage.

> [A]n agreement ... to refinance an existing first lien mortgage loan also would be considered the making of a loan for purposes of [the statute]. Under this type of agreement, the present obligor pays off the prior first lien with proceeds from a new loan secured by a first lien on residential real property [even at a higher rate of interest].

Federal Home Loan Bank Board Interpretation No. 590–2, 45 Fed.Reg. 6165 (1980).[3]

In light of this discussion, I find that Fidelity's loans are secured by first liens on residential real estate, within the meaning of section 501(a)(1) of the Deregulation Act. Because the undisputed facts establish that Fidelity is entitled to the preemption of state usury law under section 501(a)(1), summary judgment will be entered against plaintiffs on Counts I, III and IV.

### B. *Plaintiffs' Summary Judgment Motion*

Plaintiffs seek summary judgment on Count II of the complaint on liability only.[4] Count II alleges that Fidelity violated the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* in each of the transactions with plaintiffs.

I have recited the law involving the TILA in a prior opinion involving Fidelity as a defendant as follows:

> Congress enacted TILA to provide *inter alia* for disclosure of the terms of consumer credit transactions, *see* 15 U.S.C. §§ 1601, 1631(a), including transactions involving the acquisition of real estate or a security interest therein. 15 U.S.C. § 1603(3); *Bissette v. Colonial Mortgage Co.,* 340 F.Supp. 1191 (D.D.C.1972), *rev'd on other grounds* 477 F.2d 1245 (D.C.Cir. 1973). Congress intended TILA to aid unsophisticated consumers and to prevent creditors from misleading consumers as to the actual cost of financing. *See Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 363–69, 93 S.Ct. 1652, 1657–60, 36 L.Ed.2d 318 (1973); *Thomka v. A.Z. Chevrolet, Inc.,* 619 F.2d 246, 248 (3d Cir. 1980).
>
> For when doing business as usual the figures on conditions randomly placed on the traditional form would reveal to the average businessman the true cost of the transaction, but for the unexperienced or uninformed there was the possibility of

---

3. This Interpretation was originally issued under the predecessor to section 501(a)(1), Act of Dec. 28, 1979, Pub.L. No. 96–161, § 106, 93 Stat. 1233, 1234, which was in effect from December 28, 1979, to March 31, 1980. However, the Bank Board has stated that it "continues to adhere" to the Interpretations issued under the predecessor statute in applying section 501(a)(1). *See* 12 C.F.R. § 590.100.

4. Plaintiff also sought summary judgment on Count III of the complaint which I granted in defendants' favor earlier in this opinion.

deception, misinformation, or at least an obliviousness to the true costs which some day they would have to pay.

*Id.*

Because TILA is remedial in nature, it is to be liberally construed in favor of the customer. *See e.g., Bizier v. Globe Financial Services, Inc.,* 654 F.2d 1 (1st Cir. 1981); *N.C. Freed Co., Inc. v. Board of Governors of Federal Reserve System,* 473 F.2d 1210 (2d Cir.1973). The Act achieves its remedial goals by a system of strict liability in favor of consumers when the mandated disclosures have not been made. 15 U.S.C. § 1640(a).

■ Thus, a creditor who fails to comply with the Act in any respect is liable to the consumer under the statute's civil liability provisions regardless of the nature of the violation or the creditor's intent. *Thomka, supra,* 619 F.2d at 249–50. A single violation of the Act gives rise to full liability for statutory damages. Under authority granted it by the statute, 15 U.S.C. § 1604, the Federal Reserve Board has promulgated regulations known as Regulation Z to carry out the statute's provisions. 12 C.F.R. § 226.1 *et seq.* As I stated above, once a violation of the Act is established, strict liability attaches. However, a creditor can avoid liability under the Act even if the creditor has not complied fully with the statutory requirements. To avoid liability, the creditor must comply with the specific statutory exceptions found in 15 U.S.C. § 1640(b), (c) and (f).

A creditor who violates TILA is liable for any actual damages plus a civil penalty of double the finance charge; the civil penalty is subject to a minimum award of $100.00 and a maximum award of $1,000.00. 15 U.S.C. § 1640(a)(1), (a)(2)(A)(i). If successful, a consumer is also entitled to an award of the costs incurred in litigating his claims under TILA, as well as a reasonable attorney's fee. 15 U.S.C. § 1640(a)(3).

■ Multiple violations of the Act do not yield multiple recoveries. If the creditor violates one or more provisions of the statute, only one statutory penalty may be assessed. 15 U.S.C. § 1640(g). *See Laubach v. Fidelity Consumer Discount Company,* C.A. No. 85–1902, slip op. (E.D.Pa. April 9, 1986) (Laubach I) [available on WESTLAW, 1986 WL4464].

In addition, under § 1635 of the Act, when a creditor takes a security interest in property which is used as the principal residence of the consumer, the consumer has the right to rescind the transaction the later of: (1) the end of the third business day following the transaction; or (2) the date on which the creditor delivers to the consumer notice of the right of rescission and the material disclosures required by the Act. 15 U.S.C. § 1635(a). In other words, if the disclosure statement fails to comply with the Act's material disclosure requirements, the consumer has a continuous right to rescind for as long as the creditor fails to comply, up to a maximum of three years. 15 U.S.C. § 1635(f).

Exercise of the right to rescind under § 1635(a) results in the consumer's discharge of liability for any finance or other charges, and any security interest which has been taken becomes void. 15 U.S.C. § 1635(b). Further, within twenty days of receiving notice of rescission, the creditor must return any money given as down payment, earnest money or the like and must take appropriate steps to terminate any security interest created. Once the creditor has performed these obligations, the consumer must tender the property obtained by the loan or its reasonable value. 15 U.S.C. § 1635(b).

In the instant case, plaintiffs Smith and Coplin seek rescission and statutory damages for Fidelity's failure to rescind within twenty days of their notices. Plaintiffs Young and Manor seek an award of statutory damages for the failure to provide required disclosures in their transactions with Fidelity.

1. The Coplin transaction

■ The Coplins claim defendants denied Mr. Coplin the right to rescind the transaction by having Mr. Coplin endorse the loan proceeds check to the car dealership the day the loan was closed. The Coplins claim that the loan was effectively disbursed at

that time in violation of 12 C.F.R. 226.23(c). The court agrees with plaintiffs' claim. This procedure runs afoul of 12 C.F.R. § 226 just as the procedure in *Laubach I, supra* did. This procedure disbursed funds prior to the expiration of the rescission period and deprived Mr. Coplin the benefits of the three day rescission period provided by statute.

█ The Coplins also claim that the defendants failed to disclose finance charges therefore undermining their right to rescind. 12 C.F.R. § 226.23(a)(3), fn. 48. These finance charges included $521.14 for unpaid city taxes and $2,908.36 for unpaid mortgages.[5] 15 U.S.C. § 1605(a) defines a finance charge as "the sum of all charges, payable directly or indirectly by the person to whom credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 12 C.F.R. § 226.4(a). Failure of a creditor to disclose the total finance charge is a material violation entitling the consumer to rescind the loan. 12 C.F.R. § 226.23(a)(3), fn. 48. Because defendant conditioned the extension of credit to Mr. Coplin on his paying these charges, I believe they should be included as finance charges. *Laubach I, supra.* I therefore conclude that defendant violated the Act by failing to include these sums as part of the finance charge.[6]

█ The Coplins further claim that the defendants failed to disclose the amount financed. 12 C.F.R. § 226.18(c) requires that the components of the amount financed be itemized. The first mandatory component of this disclosure is "[t]he amount of any proceeds distributed directly to the consumer." 12 C.F.R. § 226.18(c)(i). Fidelity itemized the amount given to Mr. Coplin as $2833.50 when he actually received a check for $1761.50. Defendant therefore violated the disclosure require-

ment of 15 U.S.C. § 1638(a)(2)(A) and 12 C.F.R. § 226.18(c).[7]

In light of the above discussion, summary judgment will be granted in the Coplin's favor regarding TILA liability.

## 2. The Smith Transaction

█ Similar to the Coplins, Mrs. Smith also alleges that Fidelity failed to disclose the accurate finance charge imposed as a result of her loan. Fidelity withheld $39.00 from Mrs. Smith's loan proceeds to satisfy existing mortgage obligations. Although these fees are generally not chargeable as finance charges per 12 C.F.R. § 226.4(e), $13.00 was never used to satisfy the mortgage. The money was not returned to Mrs. Smith and it was kept by Fidelity. Consequently, those funds were a finance charge that should have been included and disclosed as a finance charge. Defendant therefore violated the Act by failing to include this sum as part of the finance charge. *Laubach I, supra.*

█ Also similar to the Coplins, Fidelity materially violated the Act, 12 C.F.R. § 226.18(b) and (c) by failing to accurately disclose the amount distributed to the Smiths. The disclosure statement itemizes the sum of $5,224.93 as the amount given directly to the Smiths while the schedule of distribution shows that the Smiths were given a check for $4,216.59.

Summary judgment will be granted in Mrs. Smith's favor as well regarding the issue of TILA liability.

## 3. The Young/Manor transaction

█ Plaintiffs Gloria Young and Tito Manor allege that Fidelity denied their rescission rights by requiring that Mr. Manor endorse the loan proceeds check the same day as the loan transaction. As I stated with reference to the Coplin transaction

---

**5.** The fees charged to satisfy the three mortgages are not finance charges per 12 C.F.R. 226.-4(e). In addition, the record is insufficient to determine whether the appraisal, credit report and document preparation fee are reasonable within 12 C.F.R. 226.4(c)(7).

**6.** This conclusion also mandates a finding that the defendants failed to accurately disclose the

correct annual percentage rate also justifying recission per 12 C.F.R. § 226.23(a) fn. 48.

**7.** Mr. Coplin also claims his payment schedule was not accurately disclosed. Because a genuine issue of material fact exists as to whether this was a bonefide error within 15 U.S.C. § 1640(c), summary judgment is inappropriate as to this point.

and in *Laubach I*, this practice of premature endorsement of the check undermines plaintiffs' perception of a right to rescind the transaction and therefore violates the Act. Summary Judgment will be granted for plaintiffs Young and Manor on TILA liability as well.