FIDELITY FINANCIAL SERVICES, INC., Plaintiff and Counterdefendant-Appellant, v. JOSEPH HICKS *et al.*, Defendants (Joseph Hicks *et al.*, on Behalf of Themselves and All Others Similarly Situated, Counterclaimants-Appellees; Fidelity Acceptance Corporation *et al.*, Third-Party Defendants).

First District (1st Division) No. 1—89—1115

Opinion filed April 8, 1991.—Rehearing denied June 14, 1991.

Peterson, Ross, Schloerb & Seidel, of Chicago (Lawrence X. Pusateri, Craig A. Varga, and Jonathan N. Ledsky, of counsel), for appellant.

Law Offices of Daniel A. Edelman and Lawrence Walner & Associates, Ltd., both of Chicago (Daniel A. Edelman, Lawrence Walner, and Francine Schwartz, of counsel), for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

Fidelity Financial Services, Inc. (Fidelity), instituted a mortgage foreclosure against Joseph and Thelma Hicks. Mr. and Mrs. Hicks counterclaimed, alleging violation of section 4.1a of the Illinois Interest Act (Ill. Rev. Stat. 1987, ch. 17, par. 6406). Fidelity moved to dismiss, arguing that section 4.1a had been impliedly repealed. The trial court denied Fidelity's motion and certified this interlocutory appeal to determine the validity of section 4.1a. Because the appeal arises pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—615), the allegations of the second amended counterclaim are assumed true, and all inferences are drawn most favorably to Mr. and Mrs. Hicks. For the reasons below, we affirm.

Mr. and Mrs. Hicks allege that in August 1985, they contracted with Budget Construction Company (Budget) to rebuild the back porch on their home for $5,845. Budget prepared a retail installment contract, financing the $5,845 at an annual percentage rate of 18%, with 120 monthly payments of $106.05, for a total amount of $12,726. The installment contract loan was secured by a mortgage on the

Hicks home at 546 West 65th Street in Chicago. The mortgage, recorded on October 3, 1985, was neither provided for nor disclosed by the installment contract. Budget later agreed to find financing at better terms than those provided in the installment contract.

Mr. and Mrs. Hicks further allege that on September 27, 1985, they were taken to the Fidelity office in Lansing, Illinois, and told to sign several partially prepared loan documents, including an "itemization, promissory note and security agreement," a trust deed, and an insurance certificate issued by Admiral Life Insurance Company (Admiral), an affiliate of Fidelity. Mr. and Mrs. Hicks allege they signed the documents relying on Budget's representations that Fidelity provided the most favorable financing available.

The completed Fidelity documents financed an amount of $22,425.46 at an annual percentage rate of 25.93%, in 120 monthly payments of $525, for total payments of $63,000. Mr. and Mrs. Hicks were also to pay prepaid finance charges, or "points," amounting to 13.64% of the principal. In addition, Fidelity obtained a mortgage on the Hicks home, recorded on October 4, 1985. Mr. and Mrs. Hicks' monthly income was $1,800 from Mr. Hicks' job as a janitor at Oakton Community College.

Mr. and Mrs. Hicks further allege that in October 1985, Mr. Hicks became totally disabled with emphysema and was unable to continue working. Mr. and Mrs. Hicks filed a claim on the Admiral disability insurance to continue payments on the loan. Admiral refused to pay. Subsequently, Fidelity foreclosed on the mortgage.

Mr. and Mrs. Hicks counterclaimed against Budget, Fidelity, and Admiral. The first amended counterclaim alleged that "a first mortgage would secure the [Fidelity] loan." The second amended counterclaim alleged that the Fidelity loan was secured by a junior mortgage. Count I of the second amended counterclaim alleged violation of section 4.1a of the Illinois Interest Act (Ill. Rev. Stat. 1987, ch. 17, par. 6406), which limits charges in connection with loans to 3% of the loan, or "points." Count VI alleged violation of section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (the Consumer Fraud Act or CFA) (Ill. Rev. Stat. 1987, ch. 121½, par. 262), by using deceptive practices with the intent to acquire the equity in Mr. and Mrs. Hicks' home. The other counts are not appealed.

Fidelity moved to dismiss counts I and VI of the second amended counterclaim, arguing that section 4 of the Interest Act (Ill. Rev. Stat. 1987, ch. 17, par. 6404), which allows lenders to charge "any rate or amount of interest or compensation" on loans, had implicitly repealed section 4.1a. Fidelity further argued that, due to the implied

repeal of section 4.1a, its transactions fell within statutory exceptions to the CFA. The trial court denied Fidelity's motion and certified this interlocutory appeal.

Fidelity first argues that section 4 of the Interest Act implicitly repealed section 4.1a, requiring dismissal of counts I and VI of the counterclaim, the former because it alleged violations of section 4.1a, and the latter because absent section 4.1a, Fidelity's transactions fell within statutory exceptions to the CFA. Fidelity's arguments are without merit.

Section 4.1a, last amended in 1978, addresses "Charges for items paid or incurred in connection with loans," and provides in relevant part:

> "Where there is a charge in addition to the stated rate of interest payable directly or indirectly by the borrower and imposed directly or indirectly by the lender as a consideration for the loan, or for or in connection with the loan of money, whether paid or payable by the borrower, the seller, or any other person on behalf of the borrower to the lender or to a third party, or for or in connection with the loan of money, *** whether denominated 'points,' 'service charge,' 'discount,' 'commission,' or otherwise, *** the rate of interest shall be calculated in the following manner:
>
> The percentage of the principal amount of the loan represented by all of such charges shall first be computed, which in the case of *a loan with an interest rate in excess of 8% per annum secured by residential real estate, *** shall not exceed 3% of such principal amount.*" (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 17, par. 6406.)

Section 4, enacted in 1979, and as amended, provides in relevant part:

> "General Interest Rate. ***
>
> * * *
>
> *** It is lawful to charge, contract for, and receive any rate or amount of interest or compensation with respect to the following transactions:
>
> * * *
>
> (l) Loans secured by a mortgage on real estate." (Ill. Rev. Stat. 1987, ch. 17, par. 6404.)

Fidelity argues that because section 4 was enacted after section 4.1a, and allows charges of "any rate or amount of interest or compensation," it superseded the limit of 3 points provided in section 4.1a, and implicitly repealed section 4.1a. Fidelity relies on the only case addressing the relation between the statutes, *Currie v. Diamond Mort-*

*gage Corp.* (7th Cir. 1988), 859 F.2d 1538, which stated, in *dicta,* that section 4 implicitly repealed section 4.1a.

In *Currie,* an alleged violation of section 4.1a was dismissed by a Federal bankruptcy court on grounds of preemption, and alternatively, implied repeal of section 4.1a. The district court affirmed on the basis of preemption. (*Currie v. Diamond Mortgage Corp.* (N.D. Ill. 1987), 83 Bankr. 536.) The Seventh Circuit affirmed, holding that the State statutes were preempted. The opinion continued, however, and stating that the language of the two statutes could not be reconciled, given the inconsistency between the "deregulatory impetus" of section 4 and the limitations established by section 4.1a, concluded that section 4 implicitly repealed section 4.1a. (*Currie,* 859 F.2d at 1542-43.) An opinion letter of the Illinois Department of Financial Institutions, dated February 28, 1989, also cited by Fidelity, followed *Currie.*

■ But neither the Seventh Circuit nor the opinion letters of State agencies bind State courts. The contention that section 4.1a was repealed implies that the legislature has, for the last dozen years, neglected to remove a superseded statute from the books. We are not persuaded.

We presume, by its mere existence, the validity of section 4.1a, which is not rebutted here because section 4.1a demonstrates that the legislature intended to limit certain types of charges connected to loans, and that legislative intent is consistent with the "deregulatory impetus" of section 4.

Section 4 is titled "General Interest Rate," and provides that "any rate or amount of interest or compensation" may be charged and received on loans. Section 4 addresses transactions beyond consumer loans, and allowing any amount of "compensation," as well as interest, anticipates that where a transaction involves more sophisticated parties, such as corporations (section 4(1)(a)), sole proprietorships (section 4(1)(m)), securities brokers (section 4(1)(g)), banks (section 4(1)(h)), or pension funds (section 4(1)(j)), or concerns nonconsumer transactions, such as advances of money made upon warehouse receipts, bills of lading, certificates of stock or deposit, bills of exchange, bonds, or other negotiable instruments (section 4(1)(b)), or credit transactions between merchandise wholesalers and retailers (section 4(1)(c)), the parties might choose to pay the cost of money in a form other than interest. See Ill. Rev. Stat. 1987, ch. 17, par. 6404.

The money available for lending is a commodity whose cost fluctuates according to economic conditions in the lending market, and by removing restrictions on the amount of interest or compensation, sec-

tion 4(1) gave lenders greater ability to reflect the cost of money. The cost of money is also affected by the term of a loan, and a lender may lose money when a borrower prepays a long-term loan. Sections 4(2) and 4(3), however, prohibit charges for prepayment of loans, or interest charges for any period after the loan is paid in full. Thus, the lender must account for the cost of any prepayment in the interest or compensation charged.

Read in its entirety, section 4 makes money more freely available to the borrowing market by allowing a lender to pass the cost to the borrower while requiring the terms of the loan, interest and period of repayment, and not additional charges, to reflect the effect of the marketplace on the cost of money. Thus, section 4 serves the legislature's deregulatory intent.

While section 4 addresses the "general interest rate," or the actual cost of the money available for lending (including costs imposed by increased regulation of the lending market), section 4.1a addresses "charges for or in connection with the loan of money," ancillary charges not dictated by the cost of the commodity, but imposed by lenders *in connection with* loans. Those charges may be legitimate compensation for providing and managing the loan, but it should be noted that they may also be confusing to the ordinary consumer, or worse, "gimmicks, charges added on to squeeze a few extra nickels out of the borrower." (Allen, *The High Cost of Closing*, The Chicago Tribune, May 11, 1990.) Section 4.1a helps prevent an unscrupulous lender from luring an unsophisticated borrower with low interest rates that may undercut legitimate competition, only to impose additional, onerous, or undisclosed fees to compensate for the artificially low interest rate. A borrower is also protected from the discriminatory practice of "redlining," which is accomplished by charging prohibitively high fees to customers within disfavored groups.

Thus, section 4.1a protects the borrower by tying ancillary charges to the principal, a variable not influenced by the lending market. A lender may, under section 4, charge any amount necessary to reflect the cost of money, but must, under section 4.1a, limit charges not connected to the cost of the commodity to 3% of the principal, whether those charges are called "points," "service charges," "discounts," "commissions," or otherwise.

Because section 4.1a remains part of the Interest Act 12 years after its ostensible "repeal," we presume the legislature intended that section 4.1a remain in effect. More importantly, section 4 and section 4.1a address charges of a different nature and are not incompatible. Section 4.1a, rather than being inimical to the intent of section 4, fa-

cilitates section 4. By permitting any amount or rate of interest, the legislature provided that the cost of money could be passed to the borrower, assuring more money for lending. By limiting ancillary charges in connection with loans, the legislature assured that costs passed to borrowers accurately reflected the cost of money, assuring a more competitive market while limiting the possibilities for abuse. Because reasonable interpretations reconcile the statutes, we decline to repeal section 4.1a by implication.

■■ Assuming the effect of section 4.1a, count I of the Hickses' second amended counterclaim was sufficient to state a claim for violation of section 4.1a. The exhibits to the counterclaim show that on a principal amount of $22,425.46, Fidelity charged a "prepaid finance charge" of $3,058.02, or 13.46% of the principal, well in excess of the 3% limit of section 4.1a. Although the loan agreement showed that the prepaid finance charge was part of the total amount of interest, the terms of the loan, $525 for 120 months, indicated that Mr. and Mrs. Hicks would pay the amount of the prepaid finance charge twice. Further, section 6 of the Interest Act (Ill. Rev. Stat. 1987, ch. 17, par. 6413) provides penalties for knowingly collecting unlawful charges. Here, Fidelity prepared the loan documents and imposed the charges; clearly, any charge or collection of points exceeding 3% of the loan amount was "knowing." Thus, count I of the counterclaim was sufficient.

■■ Count VI of the second amended counterclaim sufficiently stated a violation of section 2 of the Consumer Fraud Act (Ill. Rev. Stat. 1987, ch. 121½, par. 262) through the use of deceptive lending practices with the intent to acquire the equity in Mr. and Mrs. Hicks' home. The count alleged that Fidelity deliberately structured the loan to create payments and charges it knew Mr. Hicks could not afford, to precipitate a default and foreclosure.

Fidelity contends that absent limits on interest rate or charges, the loan fell within the statutory exception provided by section 10b of the CFA (Ill. Rev. Stat. 1987, ch. 121½, par. 270b), which excepts transactions authorized by law. But given the validity of section 4.1a, the finance charge exceeding three points was not authorized by law. Moreover, count VI incorporated paragraphs 1 through 39 of the counterclaim, which alleged deceptive and misleading practices without regard to section 4.1a. Even had section 4.1a been repealed, implicitly or explicitly, count VI was sufficient.

■■ Fidelity also contends that count VI cannot stand because section 2E (Ill. Rev. Stat. 1987, ch. 121½, par. 262E) and section 2F (Ill. Rev. Stat. 1987, ch. 121½, par. 262F) of the CFA allow actions only

against multiple, "willful" and "material" violations. But Fidelity misreads the CFA when it asserts that section 2F requires multiple violations, as that section provides penalties for violation of "any Illinois statutory provision regulating the extension of credit." (Ill. Rev. Stat. 1987, ch. 121½, par. 262F.) Further, the requirement of multiple violations in section 2E does not apply to section 2F, as Fidelity contends, and the case upon which Fidelity relies for that proposition does not so hold. (See *Lanier v. Associates Finance, Inc.* (1986), 114 Ill. 2d 1, 499 N.E.2d 440.) Fidelity's arguments concerning the insufficiency of count VI are without merit.

Finally, we address whether section 4.1a was preempted here by section 501 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA) (12 U.S.C. §1735f—7a (1988) (as amended)). Section 501 of DIDMCA provides in relevant part:

"(1) The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is—

(A) secured by a first lien on residential real property, by a first lien on all stock allocated to a dwelling unit in a residential cooperative housing corporation, or by a first lien on a residential manufactured home ***." (12 U.S.C. §1735f—7a(a)(1)(A) (1988).)

Fidelity does not now argue that section 4.1a was preempted by DIDMCA, relying, rather, on its argument of implied repeal. But Fidelity raised preemption in support of its motion to dismiss, and now maintains that if section 4.1a is given effect, the issue of preemption remains as a question of fact. The record and pleadings appear sufficient, however, to support a ruling that section 4.1a was not preempted.

In the late 1970s, interest rates exceeded the levels lenders could legally charge under State usury laws. The resulting reduction in funds available for borrowing was particularly hard on the housing industry: less money was available for mortgages, and greater down payments and shorter mortgage terms were required. Congress responded by enacting DIDMCA, which eliminated interest rate limits set by State usury laws with respect to first mortgage real estate financing. By removing limits to the interest on mortgages, more funds became available for lending. See *In re Russell* (E.D. Pa. 1987), 72 Bankr. 855; *Mitchell v. Trustees of United States Mutual Real Estate Investment Trust* (1985), 144 Mich. App. 302, 375 N.W.2d 424. See

also Ewing & Vickers, *Federal Pre-Emption of State Usury Laws Affecting Real Estate Financing*, 47 Mo. L. Rev. 171 (1982).

But Congress did not intend to repudiate the principle that there should be limits to the rate of interest that a lender can legally charge. Congress recognized, correctly, that the forces that compelled DIDMCA were not permanent and, accordingly, the statute provided that if, between April 1, 1980, and April 1, 1983, a State declined to have Federal preemptions apply, the State usury laws would become effective. 12 U.S.C. 1735f—7a(b)(2) (1988).

■ Given the legislative intent of DIDMCA and its interrelationship with State statutes, it is appropriate to apply DIDMCA only to those transactions clearly provided within its scope (*In re Russell*, 72 Bankr. at 867), and section 501 provides three criteria to determine its applicability. First, section 501, by its terms, would not preempt a State statute such as section 4.1a unless the loan was secured by a mortgage with priority over other mortgages or liens. Second, as section 501 reflects the congressional intent to stimulate the housing industry, the "first lien on residential real property" language should be interpreted to apply only to purchase-money mortgages. (*Mitchell v. Trustees of United States Mutual Real Estate Investment Trust* (1985), 144 Mich. App. 302, 310, 375 N.W.2d 424, 431.) Finally, the creditor must bear the burden of showing that the transaction in issue fell within the scope of DIDMCA. *In re Russell*, 72 Bankr. at 867-68.

■■ Here, section 4.1a clearly was not preempted by DIDMCA because the Fidelity loan was not a purchase-money mortgage. Further, it is unclear that the trust deed securing the Fidelity loan was a "first lien." The second amended counterclaim alleged the mortgage was a junior mortgage, and the record contains the trust deed obtained by Fidelity and the earlier mortgage obtained by Budget. The pleadings allege a subordinated mortgage, and that allegation is supported by the exhibits. Because the allegations are assumed true, we assume the subordinate nature of the Fidelity trust deed.

Further, when Fidelity raised the preemption argument to support its motion to dismiss, it offered no indication that it could establish that the transaction fell within the scope of DIDMCA. Rather, Fidelity maintained that the first amended counterclaim alleged that the Fidelity loan was to be secured by a first mortgage, and because that counterclaim was verified, the allegation must stand as a binding admission, notwithstanding the allegation of the second amended counterclaim. Amended pleadings generally supersede prior pleadings, but where the earlier pleadings were verified, they remain part of the record, and any admissions not the product of mistake or inadvertence

become binding judicial admissions. *Rynn v. Owens* (1989), 181 Ill. App. 3d 232, 235, 536 N.E.2d 959.

Here, the allegations of the respective counterclaims do not appear contradictory. Paragraph 17 of the first amended counterclaim alleged:

> "The papers that [Mr. and Mrs. Hick] signed, as eventually completed by [Fidelity], provided for a loan with an amount financed of $22,425.46, prepaid finance charges or 'points' of $3,058.02, and interest of $37,516.52, making the total obligation $63,000. *A first Mortgage or trust deed would secure the loan.*" (Emphasis added.)

Paragraph 22 of the second amended counterclaim alleged:

> "The papers that [Mr. and Mrs. Hicks] signed, as eventually completed by [Fidelity], provided for a loan with the following terms:
>
> (a) A purported amount financed of $22,425.46.
>
> (b) Prepaid finance charges or 'points,' purportedly in the amount of $3,058.02.
>
> (c) Interest of $37,516.52.
>
> (d) A purported finance charge of $40,574.54.
>
> (e) Total payments of $63,000.
>
> (f) A junior mortgage, which was duly recorded on October 4, 1985."

The allegation in the first amended counterclaim appears subjunctive, alleging the anticipated form of the security interest, while the allegation in the second amended counterclaim appears retrospective, stating the form that the security interest ultimately took. The former did not preclude the latter, thus Fidelity's assertion was without merit.

Even if the record was insufficient to determine whether the Fidelity loan was within the scope of DIDMCA, it would be inappropriate to rule that section 4.1a was preempted. This appeal arises from a motion to dismiss the counterclaim as insufficient, but the counterclaim alleges sufficient facts to remove the Fidelity transaction from the scope of DIDMCA. Even if no ruling was made with respect to preemption, the counts could not be dismissed, and Fidelity would have the burden, on remand, to show that the State statutes were preempted.

In summary, section 4.1a was not preempted here because the second amended counterclaim alleged sufficient facts to show that the Fidelity loan was not within the scope of DIDMCA. It was alleged that the loan was secured by a junior mortgage, the loan was not a purchase-money loan, and Fidelity offered no showing to the contrary in

its motion to dismiss. Accordingly, the second amended counterclaim properly alleges State law claims.

In conclusion, we hold that section 4.1a remains valid, and therefore, counts I and VI of the second amended counterclaim were sufficient to state claims. Further, without regard to the Interest Act, count VI sufficiently alleged violations of the Consumer Fraud Act. Finally, because the pleadings allege the Fidelity loan was not a purchase-money loan, and secured with a junior mortgage, and because those allegations are supported by exhibits in the record, the State law claims were not preempted. Accordingly, we affirm the trial court's denial of Fidelity's motion to dismiss and remand for proceedings consistent with our rulings.

Affirmed and remanded.

MANNING, P.J., and CAMPBELL, J., concur.