MITCHELL v TRUSTEES OF UNITED STATES MUTUAL REAL
ESTATE INVESTMENT TRUST

Docket No. 79225. Submitted May 7, 1985, at Lansing.—Decided July
15, 1985. Leave to appeal applied for.

William E. and Paula L. Mitchell borrowed $65,200 from the
Bank of Lansing in 1978 for the construction and purchase of a
home. Interest was set at 10%, and the 30-year promissory note
was secured by a mortgage, which was subsequently recorded.
In 1980, the Mitchells borrowed $10,200 from United States
Mutual Real Estate Investment Trust in order to repay other
debts. With the addition of various fees, the Mitchells' total
indebtedness to U. S. Mutual became $13,380.66. This amount,
together with the principle balance on the note held by Bank of
Lansing, amounted to $77,600. The Mitchells executed a seven-
year "wrap-around mortgage note" in favor of U. S. Mutual in
the amount of $77,600, secured by a second mortgage on their
home. The wraparound mortgage note provided for interest at
11% on the balance of the wraparound loan. Payments on the
wraparound mortgage note were made in a timely fashion for a
while, but then the Mitchells' payments began falling behind
schedule. U. S. Mutual instituted foreclosure proceedings, after
which the Mitchells made a $5,700 payment to U. S. Mutual.
The Mitchells then stopped making payments to U. S. Mutual
and started making payments on the Bank of Lansing note
directly to the Bank of Lansing. When the Mitchells stopped
making payments on the wraparound mortgage note, U. S.
Mutual again instituted foreclosure proceedings, which eventu-

REFERENCES FOR POINTS IN HEADNOTES

[1, 5, 6] Am Jur 2d, Interest and Usury § 111 *et seq.*
  Validity and effect of "wraparound" mortgages whereby purchaser
  incorporates into agreed payments to grantor latter's obligation
  on initial mortgage. 36 ALR4th 144.
[2] Am Jur 2d, Mortgages § 323 *et seq.*
  See the annotations in the ALR3d/4th Quick Index under Mort-
  gages.
[3] Am Jur 2d, Mortgages § 1 *et seq.*
[4] Am Jur 2d, Contracts § 276.
  See the annotations in the ALR3d/4th Quick Index under Con-
  tracts.

ally resulted in U. S. Mutual's high bid of $16,664.17 for the Mitchell home at a sheriff's sale. The Mitchells filed suit against the Trustees of United States Mutual Real Estate Investment Trust and Detroit Bond and Mortgage Company, U. S. Mutual's agent and manager for the loan, in Ingham Circuit Court alleging *inter alia* that the interest on the wraparound note was usurious because it exceeded 7%, the maximum allowed under Michigan law. In response to that claim, defendants argued that the interest charged under the wraparound mortgage note was not usurious because the transaction was governed by the terms and conditions of the Depository Institutions Deregulation and Monetary Control Act of 1980, a federal act which preempts state usury laws under certain conditions. Both parties moved for partial summary judgment on the usury issue. The court, Robert Holmes Bell, J., granted partial summary judgment in favor of defendants. Plaintiffs appealed. The Court of Appeals granted the Attorney General leave to intervene. *Held:*

In order for the state usury law to have been preempted by the federal act in this case, the wraparound mortgage note would have had to have been secured by a first lien made after March 31, 1980, by a qualified creditor. The wraparound mortgage at issue does not qualify as a first lien under either the federal or state criteria and U. S. Mutual is not a qualified lender under the terms of the federal act. The trial court erred as a matter of law in holding that federal law preempts application of Michigan's usury statutes to the wraparound mortgage rate. The decision of the circuit court is reversed, entry of summary judgment in favor of plaintiffs on their motion is ordered, and the remainder of the issues are remanded for trial on the merits.

Reversed and remanded.

1. MORTGAGES — WRAPAROUND MORTGAGES — INTEREST — USURY — PREEMPTION OF STATE USURY LAWS.

State usury laws applicable to wraparound mortgage notes are preempted by the Depository Institutions Deregulation and Monetary Control Act of 1980 where the otherwise acceptable wraparound mortgage note is secured by a first lien, is made after March 31, 1980, and is made by a qualified creditor (12 USC 1735f-5[b][2][D], 1735f-7).

2. MORTGAGES — RECORDING — PRIORITY.

Michigan is a recording priority jurisdiction; mortgages are subjected to the satisfaction of the obligation on the mortgage note in the order in which they are recorded (MCL 565.25; MSA 26.543).

3. MORTGAGES — SECONDARY MORTGAGE LOANS.

> A secondary mortgage loan is a loan which, *inter alia,* is secured by a mortgage upon an interest in real property if the property is subject to the lien of one or more prior mortgages (MCL 493.51 *et seq.;* MSA 26.568[1] *et seq.).*

4. CONTRACTS — AMBIGUOUS LANGUAGE — JUDICIAL CONSTRUCTION.

> Ambiguous language in a document should be strictly construed against the drafter of the document.

5. MORTGAGES — SECONDARY MORTGAGE LOANS — REFINANCING —
   INTEREST — USURY — PREEMPTION OF STATE USURY LAWS.

> Congress, in enacting the Depository Institutions Deregulation and Monetary Control Act of 1980, did not intend to include junior mortgages executed for refinancing purposes among the loan transactions exempted from state usury laws (12 USC 1735f-7).

6. MORTGAGES — SECONDARY MORTGAGE LOANS — WRAPAROUND
   MORTGAGES — PREEMPTION OF STATE USURY LAWS.

> One criterion which must be met before federal law will preempt state usury laws applicable to wraparound mortgages is that the creditor must regularly extend consumer credit, payable either in four or more installments or for which a finance charge is required, and must make or invest in residential real estate loans aggregating more than $1 million per year (12 USC 1735f-5[b][2][D], 15 USC 1602[f]).

*MacLean, Seaman, Laing & Guilford* (by *Dwight D. Ebaugh),* for plaintiffs; and *Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Luis F. Fernandez,* Assistant Attorney General, Consumer Protection Division, for intervening plaintiffs.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Timothy A. Fusco* and *Kathleen McCree Lewis);* and *Cooper & Fink* (by *Daniel S. Cooper),* for defendants.

Before: R. B. BURNS, P.J., and BRONSON and R. L. TAHVONEN,* JJ.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

R. B. BURNS, P.J. This action involves a $77,600 non-purchase-money "wraparound" mortgage note made by plaintiffs Mitchell and payable to defendant United States Mutual Real Estate Investment Trust with interest of 11%. The circuit court held that Michigan's usury statutes had been preempted by federal legislation so that the note was not usurious as a matter of law. We reverse.

On August 21, 1978, plaintiffs borrowed $65,200 from the Bank of Lansing for the construction and purchase of a home. Interest was set at 10%. Under the terms of a 30-year promissory note, payments of $572.46 were to be made monthly. The note was secured by a mortgage which was recorded on August 24, 1978. Bank of Lansing is not a party to this suit.

On October 28, 1980, plaintiffs borrowed $10,200 from U S Mutual in order to repay other debts. Additionally, plaintiffs were assessed various fees by defendants for a total indebtedness of $13,380.66. The loan was arranged by defendant Detroit Bond and Mortgage Company, as agent and manager of U S Mutual. At the time of this loan, the principal balance of plaintiffs' Bank of Lansing note was $64,219.34. This balance plus the indebtedness to U S Mutual amounted to $77,600, the face amount of a seven-year "wrap-around mortgage note". By its terms, the note was secured by a second mortgage on plaintiffs' home:

"A. The lien of this Mortgage is subordinate and inferior to the lien of a certain Mortgage (the 'First Mortgage') dated August 21, 1978, and recorded August 24, 1978, in liber 556, Page 279, Eaton County records, executed by Mortgagor to BANK OF LANSING, covering the Mortgaged Property and securing the payment of a certain Mortgage Note (the 'First Mortgage Note') of even date therewith in the original amount of

$65,200.00 executed by Mortgagor and payable to the order of BANK OF LANSING as therein provided."

The wraparound mortgage note provided for an interest rate of 11% on the balance of the wraparound loan. Under the terms of the wraparound note, plaintiffs were to make minimum monthly payments of $761 to U S Mutual; however, a rider to the note indicated a monthly payment of $849 would be required to amortize within seven years the amount owed U S Mutual.

From the monthly payments made by plaintiffs to U S Mutual, U S Mutual was to remit $722.46 each month to Bank of Lansing ($572.46 principal plus interest and $150 tax escrow). The balance of plaintiffs' monthly payments was to be applied to plaintiffs' indebtedness to U S Mutual. The mortgage rider further provided:

"C. The occurrence of an event of default under the First Mortgage Note or the First Mortgage or any loan agreement, security agreement or other document or instrument evidencing or securing the payment of the First Mortgage Note or executed in connection therewith (the 'Collateral Documents') shall constitute an 'Event of Default' hereunder; and upon the occurrence of any such Event of Default, Mortgagee may pay any sum which may be in default under the First Mortgage Note, First Mortgage or the Collateral Documents or advance any sum for the purpose of curing any default thereunder, and any sum so paid or advanced by Mortgagee, together with interest thereon at the rate of 12% per annum from the date of advancement until paid, shall be immediately due and payable by Mortgagor to Mortgagee and shall be and become a part of the Indebtedness secured hereby. The rights and remedies of Mortgagee under this paragraph shall be cumulative of all of the other rights and remedies of mortgagee under law and under this Mortgage."

After repayment of the wraparound loan, plaintiffs

would continue to make payments on the Bank of Lansing mortgage for the balance of its 30-year term.

Between November 1980 and November 1981, plaintiffs paid U S Mutual $911 per month on the wraparound note. Between December 1981 and December 1982, plaintiffs made 10 monthly payments of $921. In January 1983, U S Mutual instituted foreclosure proceedings. In March 1983, plaintiffs made a payment of $5,700 to U S Mutual. In February 1983, plaintiffs sought a statement of account from U S Mutual but were unsatisfied with the response. Plaintiffs began paying the Bank of Lansing directly on the first mortgage note.

When payments on the wraparound mortgage note ceased, U S Mutual commenced a second foreclosure action against plaintiffs. On July 15, 1983, U S Mutual caused a sheriff's sale of plaintiffs' residence to be held. U S Mutual tendered the high bid of $16,664.17. Plaintiffs' right of redemption was set to expire on January 15, 1984.

Plaintiffs filed a complaint against U S Mutual and Detroit Bond and Mortgage Company on January 10, 1984. One of the two counts alleged was that the interest on the wraparound note was usurious because it exceeded 7%, contrary to MCL 438.31; MSA 19.15(1). Subsequently, a temporary restraining order to stay the running of the redemption period was entered.

In defendants' answer, as an affirmative defense to the usury count, they averred that the interest charged under the wraparound mortgage note was not usurious for the reason that the transaction was governed by the terms and conditions of the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub L 96-221, Title V, § 501(a)(1), 94 Stat 161, 12 USC 1735f-7. Under this

act, state usury laws are preempted under certain circumstances.

Both parties filed motions for partial summary judgment on the usury count. Plaintiffs' theory was that (1) pursuant to Michigan law, defendants were limited to charging interest not exceeding 7%, (2) preemption under federal law applies only to first liens, and (3) as a matter of law, the wraparound mortgage in this case was not a first lien. Defendants' theory was that (1) federal law preempts state usury statutes when loans made by certain creditors are secured by a first lien on residential real property, (2) that the wraparound mortgage in the instant case constituted a "first lien" as defined by the Federal Home Loan Bank Board (FHLBB), and (3) that U S Mutual was a "creditor" as contemplated by the preemption statute.

The trial judge granted defendants' motion for partial summary judgment and the final order was entered on June 27, 1984. Plaintiffs appeal. This Court has granted the Attorney General leave to intervene.

A wraparound mortgage is a junior mortgage which secures a promissory note with a face amount equal to the sum of the principal balance of an existing mortgage note plus any additional funds advanced by the wraparound lender. Wraparound mortgages may be used in several forms, depending upon the status of the lender and the borrower in relationship to the property encumbered. Typically, however, wraparounds are either *purchase-money* mortgages, where the wraparound lender is either the real estate seller or a third party, or *refinancing* or *non-purchase-money* mortgages, where the lender is either the same lender that holds the first mortgage or a third party. See Arditto, *The Wrap-Around Deed of Trust: An An-*

*swer to the Allegation of Usury,* 10 Pac L J 923 (1979), for a discussion of various types of wraparound mortgages.

This case involves a third party, non-purchase-money type of wraparound transaction. In such transactions, the borrower's payment under the second, wraparound note covers the debt service on both the first indebtedness and the additional loan advance. While not assuming the original mortgage note obligation, the wraparound lender undertakes to make the payments on the original, "wrapped" mortgage note as it receives wraparound payments from the borrower.[1]

In a wraparound situation, the lender is by definition advancing only a portion of the face value of the wraparound note, but it receives interest calculated on the full face amount of the note. Generally, it is this increased yield which raises usury problems.[2]

MCL 438.31; MSA 19.15(1), Michigan's basic usury statute, provides:

"The interest of money shall be at the rate of $5.00 upon $100.00 for a year, and at the same rate for a greater or less sum, and for a longer or shorter time, except that in all cases it shall be lawful for the parties

[1] For a description of this method of financing see *Prince George's County v McMahon,* 477 A2d 1218, 1220 (Md App, 1984).

[2] This is well illustrated by the instant case. Plaintiffs received a cash advance of $10,200. They were obligated to pay 11% interest calculated on the $77,600 face amount of the wraparound note. When the total dollar amount of interest plaintiffs would pay on the note as drafted is recalculated on the basis of the $10,200 actually advanced to them, rather than on the full face amount of the wraparound note, effective interest would be at a rate of 12% to 20-1/8% on the loan, depending on the formula used. See *Penziner v West American Finance Co,* 24 P2d 501 (Cal App, 1933); *Mindlin v Davis,* 74 So 2d 789 (Fla, 1954). In the instant case, plaintiffs contend that the 11% interest rate on the face value of the wraparound note exceeds the 7% interest ceiling set by MCL 438.31; MSA 19.15(1). They do not argue the excessiveness of the even higher effective rate of interest on the note.

to stipulate in writing for the payment of any rate of interest, not exceeding 7% per annum."

U S Mutual asserts that it is exempt from the 7% interest ceiling of this statute by virtue of the Depository Institutions Deregulation and Monetary Control Act of 1980. Section 501(a)(1) of that act, 12 USC 1735f-7, provides:

"The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is—

"(A) secured by a first lien on residential real property, by a first lien on stock in a residential cooperative housing corporation where the loan, mortgage, or advance is used to finance the acquisition of such stock, or by a first lien on a residential manufactured home;[3]

"(B) made after March 31, 1980; and

"(C) described in section 527(b) of the National Housing Act (12 U.S.C. 1735f-5(b) * * *."

The act further states:

"(f) The Federal Home Loan Bank Board is authorized to issue rules and regulations and to publish interpretations governing the implementation of this section.

"(g) This section takes effect on April 1, 1980."

12 USC 1735f-5(b)(2)(D) provides that the term "federally related mortgage loan" means any loan which:

"is made in whole or in part by any 'creditor', as defined in section 1602(f) of title 15, who makes or

---

[3] The subsequent amendment of this paragraph does not affect this case.

invests in residential real estate loans aggregating more than $1,000,000 per year."

In 1980, when the wraparound mortgage in the instant case was made, 15 USC 1602(f) read:

"The term 'creditor' refers only to creditors who regularly extend, or arrange for the extension of, credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise."[4]

Thus, in the instant case, state usury laws are preempted if the wraparound mortgage note in the instant case was (1) secured by a "first lien", (2) made after March 31, 1980, and (3) made by a qualified creditor. It is undisputed that the note in the present case was made after March 31, 1980. We proceed to consider whether tests (1) and (3) have also been satisfied.

### The first lien requirement

Pursuant to its statutory authority, the FHLBB has promulgated rules regarding preemption of state usury laws. 12 CFR 590.2(c) defines "[l]oans which are secured by first liens on real estate" as

"loans on the security of any instrument (whether a mortgage, deed of trust, or land contract) which makes

---

4 15 USC 1602(f) now reads:

"The term 'creditor' refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required; and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. * * *"

the interest in real estate (whether in fee, or in a leasehold or subleasehold extending, or renewable, automatically or at the option of the holder or the lender, for a period of at least 5 years beyond the maturity of the loan) specific security for the payment of the obligation secured by the instrument: *Provided,* That the instrument is of such a nature that, in the event of default, *the real estate described in the instrument could be subjected to the satisfaction of the obligation with the same priority as a first mortgage of a first deed of trust in the jurisdiction where the real estate is located."* (Emphasis added.)

U S Mutual has consistently admitted that the wraparound mortgage in the instant case was second in time to the Bank of Lansing mortgage on plaintiffs' property, and that, technically, their wraparound is not secured by a "first lien". Nevertheless, U S Mutual successfully argued below that the FHLBB has given the phrase "first lien" an expansive definition which encompasses plaintiffs' wraparound mortgage.

In 1980, the FHLBB's associate general counsel, in an interpretive letter, maintained that wraparounds could qualify as first liens.[5] U S Mutual relies heavily on this letter in its contention that

---

[5] The letter opinion, dated May 20, 1980, states:

"A wraparound mortgage is generally a loan secured by a property on which another lender has a prior lien. Under the terms of these transactions, the borrower is required to make payments to the second lender in amounts sufficient to liquidate the principals and interests due on both mortgages. The second lender will remit a portion of this payment to the first lender and thus will be in a position to cure any potential default on the first loan.

\* \* \*

"In our view a wraparound mortgage of the type described would qualify as a loan secured by a first lien if funds are immediately available for the liquidation of the first lien. In previous opinions regarding wraparounds, the technical second lien status of the loan was not considered controlling as long as the lender had the ability to either cure defaults or convert its lien to a first lien in the event of default. These same considerations determine the applicability of the Federal usury preemption."

it holds a "first lien" on the Mitchell property, since it *could* liquidate the Bank of Lansing mortgage. However, as the Attorney General notes, interpretive rules and general statements of policy are not legally binding. *Aiken v Obledo,* 442 F Supp 628 (E D Cal, 1977); *Pacific Gas & Electric Co v Federal Power Comm'r,* 164 US App DC 371; 506 F2d 33 (1974). Furthermore, the FHLBB is apparently no longer taking a position as to the status of wraparound loans. See Randolph, *Home Finance in the Shadow World: Unsolved Usury Problems Affecting Adjustable Rate and Wraparound Mortgages in Missouri,* 51 UMKC L Rev 41, 44, fn 10, citing FHLBB Interpretive Letter No. S19 (March 3, 1981). A regulation proposed by the FHLBB in 1980 defined a wraparound loan as a first lien loan if the wraparound lender retained sufficient funds to satisfy the "prior indebtedness". 45 Fed Reg 86,50-02. However, the proposed regulation was never adopted. We think this apparent retreat from the FHLBB's 1980 position substantially undermines defendants' argument. Further, the sparse but unanimous conclusion among the commentators who have considered the issue is that wraparound mortgages such as the one in the instant case are not "first liens" for federal preemption purposes.[6]

As previously noted, 12 CFR 590.2(c) defines "[l]oans which are secured by first liens on real estate" as those whereby the real estate could be subjected to the satisfaction of the obligation with the same priority as a first mortgage *"in the*

---

[6] *Practicing Law Institute, Mortgages and Alternate Mortgage Instruments* (Real Estate Law and Practice Course Handbook Series #187) (1981); Randolph, *Home Finance in the Shadow World: Unsolved Usury Problems Affecting Adjustable Rate and Wraparound Mortgages in Missouri,* 51 UMKC L Rev 41 (1982); Ewing & Vickers, *Federal Pre-Emption of State Usury Laws Affecting Real Estate Financing,* 47 Mo L Rev 171 (1982).

*jurisdiction where the real estate is located".* (Emphasis added.) Therefore, analysis under state law is appropriate. Michigan is a recording priority jurisdiction. Mortgages are subjected to the satisfaction of the obligation on the mortgage note in the order in which they are recorded. *American Federal Savings & Loan Ass'n v Orenstein,* 81 Mich App 249; 265 NW2d 111 (1978); MCL 565.25; MSA 26.543.[7] Since the wraparound mortgage was executed and recorded after the Bank of Lansing mortgage, it is "subject to such lien" and hence does not have the priority of the first lien under Michigan recording law.

Moreover, the secondary mortgage act, MCL 493.51 *et seq.;* MSA 26.568(1) *et seq.,* defines a secondary mortgage loan to be a loan which, among other requirements, is secured by a mortgage upon an interest in real property if the property is subject to the lien of one or more prior mortgages. Subsection 1(d). Since in the instant case the Mitchell home is subject to a senior lien held by the Bank of Lansing, the wraparound mortgage held by the U S Mutual is, by definition, secondary.

---

[7] "In the entry book of deeds, the register shall enter all deeds of conveyance absolute in their terms, and not intended as mortgages or securities, and all copies left as cautions, and in the entry book of mortgages he shall enter all mortgages and other deeds intended as securities, and all assignments of any such mortgages or securities; and in the entry book of levies he shall enter all levies, attachments, notices or lis pendens, sheriffs' certificates of sale, and United States marshals' certificates of sale, noting in such books, the day, hour and minute of the reception and other particulars, in the appropriate columns in the order in which such instruments are respectively received, and every such instrument shall be considered as recorded at the time so noted. And the record of such levies, attachments, notices, lis pendens, sheriffs' certificates, marshals' certificates, and the original papers required by statute to be recorded to perfect such levies, attachments, notices, lis pendens and certificates on record in the office of the register of deeds, shall be notice to all persons, of the liens, rights and interests acquired by or involved in such proceedings, and *all subsequent owners or incumbrancers shall take subject to such liens,* rights or interests." (Emphasis added.)

The wraparound mortgage and note in question declare several times that the wraparound mortgage is not the first mortgage, and that the lien of the mortgage is subordinate and inferior to that executed by plaintiffs to the Bank of Lansing. There is no ambiguity in the documents concerning the subordinate nature of the wraparound lien. Even if there were, the language of the documents should be strictly construed against U S Mutual as their drafter. *Fort Pitt Malleable Iron Co v Detroit Steel Products Co,* 260 Mich 683; 245 NW 546 (1932).

Further, a consideration of the economic conditions and legislative history surrounding the Depository Institutions Deregulation and Monetary Control Act of 1980 leads to the conclusion that Congressional intent in preempting state usury laws in the context of "first liens" was to stimulate the purchase of homes. As anomalous as lifting interest ceilings to aid the home buyer may seem, plaintiffs' contention is sound:

"As interest rates increased in the late 1970's, however, state usury laws not pre-empted by Congress reduced the availability of funds for lending, discriminated against small borrowers, caused funds to flow to 'nonceiling states,' and unduly influenced legal forms of ownership. The effect was particularly severe on the housing industry: state usury ceilings reduced the supply of mortgage funds, raised down payment requirements, and resulted in shorter term mortgages, as lenders sought to protect themselves against long-term, fixed-rate mortgages.

"In reaction to these adverse effects on lending in general and specifically on real estate financing, Congress passed temporary pre-emption statutes in late 1979, followed by sweeping pre-emption statutes passed as part of the Depository Institutions Deregulation and Monetary Control Act of 1980 (the 'Act'). The Act completely eliminated state usury ceilings with regard

to first mortgage residential real estate financing and provided federal ceilings for the interest chargeable on business and agricultural loans and loans made by insured banks, savings and loan associations, credit unions, and small business investment companies." 47 Mo L Rev 171, 171-172. (Footnotes omitted.)

Section 501 of the act seems to reflect a congressional effort to stimulate the housing industry by assuring the availability of home loans, albeit at potentially high interest rates. It follows, then, that a construction of § 501's "first lien" language should be limited to those mortgages which secure purchase money loans and not extended to non-purchase-money wraparound transactions aimed at refinancing and debt consolidation. Refinancing transactions, such as that in the instant case, do nothing to further federal housing policies. In our opinion, it was not the intent of Congress in enacting § 501 to include junior mortgages executed for refinancing purposes among the loan transactions exempted from state usury laws.

Based upon the foregoing considerations, we conclude that the lower court erred as a matter of law in holding that federal law preempts application of Michigan's usury statutes to the wraparound mortgage note. We find unpersuasive the reasoning of U S Mutual and the lower court that a second mortgage is the equivalent of the first lien simply because U S Mutual *could,* both contractually and financially, liquidate the first mortgage held by Bank of Lansing and thus convert itself to the status of first mortgagee. Any junior mortgagee, wraparound or otherwise, can protect its security interest by curing a default on the senior mortgage. Thus, under U S Mutual's reasoning, any mortgage is potentially a "first lien", no matter how many intervening encumbrances may exist, so long as the subsequent mortgagee has

sufficient assets to discharge the more senior mortgages if the mortgagor defaults on them. In short, to adopt this view is to say that *all* mortgages "may" be "first liens". The result is that in reality there would be no first lien at all. More importantly, all such mortgages would be exempt from Michigan's usury statutes.

### The qualified creditor requirement

As previously noted, in order for state usury laws to be preempted by federal law, not only must the loan in question be secured by a "first lien", but it must also be made by a qualified lender. To so qualify, the lender must (1) regularly extend consumer credit, payable either in four or more installments or for which a finance charge is required, 15 USC 1602(f), *and* (2) make or invest in residential real estate loans aggregating more than $1 million per year, 12 USC 1735f-5(b)(2)(D).

In support of its motion for partial summary judgment pursuant to GCR 1963, 117.2(3), U S Mutual focused on the second test, contending it loaned more than $1 million per year on residential real estate and, therefore, the wraparound loan qualified as a federally related mortgage loan as required by the relevant statutes. In support of this contention, U S Mutual produced the affidavit of Samuel M. Thompson, an agent of U S Mutual's successor corporation, U S Mutual Financial Corporation. In the affidavit, Thompson stated that U S Mutual "was a creditor making or investing in loans aggregating more than one million dollars per year" when it entered into the transaction with plaintiffs.

Plaintiffs, on the other hand, focused on the first requirement and contended that U S Mutual was not a creditor who regularly extends consumer

credit. This position was supported by a letter dated May 20, 1982, from U S Mutual to the Attorney General which stated in part:

"The Trust is a real estate investment trust. In recent years, since the adoption of the Depository Institutions Deregulation and Monetary Control Act of 1980, the Trust has from time to time lent money on the security of 'wraparound' mortgages, to the owners of residential real property mortgaged as security, not for purchase of that property, but for business purposes of those borrowers."

The Thompson affidavit makes no mention of the consumer credit extended by U S Mutual. Thus, the court was left only with proofs that U S Mutual made or invested in real estate loans of more than $1 million. Absent a showing by U S Mutual that it regularly extended consumer credit, summary judgment on the question of whether U S Mutual was a qualified lender under federal law was premature.

The theories advanced by the defendants in their supplemental brief were not advanced or decided by the trial court and will not be considered on appeal.

We reverse the decision of the circuit court, order entry of summary judgment in favor of plaintiffs on their motion and remand the remainder of the issues for trial on the merits.