879 A.2d 1037

**Linda SWEENEY**

v.

**SAVINGS FIRST MORTGAGE, LLC.**

**No. 148, Sept. Term, 2004.**

Court of Appeals of Maryland.

Aug. 9, 2005.

320

Frank Paul Bland, Jr. (Trial Lawyers for Public Justice, Washington, DC; Scott C. Borison and Douglas B. Bowman, Legg Law Firm, LLC, Frederick), on brief for Appellant.

Michael R. Schuster, AARP, Stuart Cohen, AARP Foundation Litigation, Washington, DC, Beth Mellen Harrison, Francis D. Murnaghan, Public Justice Center, Baltimore, Brief of Amici Curiae, the Public Justice Center, the Maryland Consumer Rights Coalition, the Community Law Center, the National Consumer Law Center, the Center for Responsible Lending and AARP.

John A. McCauley (Craig E. Smith, James E. Weaver, Michael J. DeVinne, Venable LLP, Baltimore), on brief for Appellee.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, Judge.

Linda R. Sweeney brought suit against Savings First Mortgage, L.L.C. (Savings First) in the Circuit Court for Frederick County, alleging a violation of the Maryland Finder's Fee Law. Md.Code (1975, 2000 Repl.Vol.), §§ 12–801–12–809 of the Commercial Law Article.[1] Savings First acted as a mortgage broker for Ms. Sweeney in the procurement of two mortgage refinance loans within a one-year period. Ms. Sweeney alleged that the mortgage broker fee charged by Savings First in connection with the second loan was in violation of the Maryland statute, specifically § 12–804(c).[2]

---

1. All citations in this opinion to the Maryland Code will be to this version of the Commercial Law Article in effect at the time of the operative facts of this case, unless otherwise specified.

2. Section 12–804(c) states:

Savings First responded to Ms. Sweeney's suit by filing a motion to dismiss, or, in the alternative, for summary judgment. In support of its motion, Savings First argued that the Finder's Fee Law was preempted by § 501(a)(1) of the Federal Depository Institutions Deregulation and Monetary Control Act,[3] and, in the alternative, was barred by the applicable Maryland one-year statute of limitations.[4] The Circuit Court granted the motion, dismissing Ms. Sweeney's complaint with prejudice based on its conclusion that § 1735f–7a of Title 12 of the United States Code preempted the Maryland statute. Ms. Sweeney noted an appeal to the Court of Special Appeals. We granted certiorari, *Sweeney v. Savings First Mortgage, L.L.C.*, 385 Md. 511, 869 A.2d 864 (2005), on our initiative while the appeal was pending in the intermediate appellate court, in order to consider the following question of first impression in this State:[5]

Is Maryland's Finder's Fee Law, and the limits it places on the fees that mortgage brokers may charge, preempted by the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA)?

Based on our analysis of the federal statute, and an investigation of the legislative history behind the DIDMCA, we hold that the Maryland Finder's Fee Law is not preempted in this

---

*Mortgage loan obtained more than once on same property.*—A mortgage broker obtaining a mortgage loan with respect to the same property more than once within a 24–month period may charge a finder's fee only on so much of the loan as is in excess of the initial loan.

3. The Depository Institutions Deregulation and Monetary Control Act is codified at 12 U.S.C. § 1735f–7a (2000).

4. Md.Code (1975, 2002 Repl.Vol.), § 5–107 of the Courts and Judicial Proceedings Article provides that "[a] prosecution or suit for a fine, penalty, or forfeiture shall be instituted within one year after the offense was committed."

5. In considering an appeal on bypass of the intermediate appellate court, this Court considers only those issues that would have been properly before the Court of Special Appeals. Md. Rule 8–131(b)(2). *See Converge Servs. Group, LLC v. Curran*, 383 Md. 462, 467 n. 1, 860 A.2d 871, 874 n. 1 (2004).

case. Accordingly, we shall reverse the judgment of the Circuit Court for Frederick County and remand this matter for further proceedings.

## I.

### A.

On 29 August 2000, Savings First acted as a mortgage broker in obtaining a refinance loan for Ms. Sweeney and Harry E. Stockman [6] secured by a residence at 9204 Oak Tree Circle in Frederick, Maryland. The amount of the loan was $140,250 and the lender for the transaction was First Union National Bank of Delaware. As payment for its efforts in brokering the loan, Savings First received a mortgage broker fee of $8,427. The following year, on or about 12 July 2001, Savings First arranged a replacement mortgage refinance loan for the same residence for Ms. Sweeney and Mr. Stockman in the amount of $158,400. The lender in this second transaction was Concorde Acceptance Corporation (Concorde). The mortgage broker fee paid to Savings First in the second transaction was $10,788. The mortgage broker fee for each transaction was rolled into the amounts financed.

### B.

Ms. Sweeney filed a complaint on 1 March 2004 in the Circuit Court for Frederick County seeking a judgment in the amount of $30,564 against Savings First.[7] Ms. Sweeney contended that the maximum fee allowed by Maryland law for Savings First's brokering of the second loan was $1,452, or 8% of $18,150, the amount of the second loan in excess of the first

---

6. Mr. Stockman is not a party to this controversy.

7. Section 12–807 states:
 Any mortgage broker who violates any provision of this subtitle shall forfeit to the borrower the greater of:
 (1) Three times the amount of the finder's fee collected; or
 (2) The sum of $500.

loan. The relevant portions of § 12–804 of the Maryland Finder's Fee Law state:

Fees mortgage broker permitted to charge.

(a) *Maximum amount of finder's fee.*—A mortgage broker may charge a finder's fee not in excess of 8 percent of the amount of the loan or advance.

\* \* \* \* \* \*

(c) *Mortgage loan obtained more than once on same property.*—A mortgage broker obtaining a mortgage loan with respect to the same property more than once within a 24–month period may charge a finder's fee only on so much of the loan as is in excess of the initial loan.

Md.Code, § 12–804.

Savings First filed its motion to dismiss for failure to state a claim, or, in the alternative, for summary judgment, on 14 May 2004. Savings First argued that Ms. Sweeney's complaint stated no basis for relief because her claim was barred by law for either of two reasons. The first contention was that § 501(a)(1) of the DIDMCA expressly preempts application of the Maryland Finder's Fee Law. Under this federal statute, a state is prohibited from "expressly limiting the rate or amount of interest, discount points, finance charges, or other charges" applying to qualifying mortgages. 12 U.S.C. § 1735f–7a(a)(1) (2000). Savings First's alternate argument was that Ms. Sweeney's claim was barred by the one-year statute of limitations applicable to penalties and forfeitures.[8] Savings First included affidavits in support of its motion demonstrating particular facts, beyond those alleged in Ms.

---

8. The Circuit Court held that the applicable statute of limitations was not one year, but did not opine what the correct applicable limitations period was. Savings First initially filed a cross-appeal in the Court of Special Appeals, but has not briefed or argued before us the limitations issue. Thus, we shall not address the statute of limitations question. *See Ricker v. Abrams,* 263 Md. 509, 516, 283 A.2d 583, 587 (1971) (stating that an issue not raised in the brief(s) or oral argument is waived); *see also* Md. Rule 8–504.

Sweeney's complaint, that it contended were material and not in genuine dispute.

At the conclusion of the motions hearing on 18 August 2004, the Circuit Court ostensibly granted the motion to dismiss Ms. Sweeney's claim, with prejudice, because § 1735f–7a preempted the cause of action brought under § 12–804 of the Maryland Commercial Law Article. In ruling on the motion, the Circuit Court did not state whether it had considered the additional facts offered by Savings First in its affidavits.[9]

## II.

■ Upon a motion by either party for summary judgment, the court "shall enter judgment in favor of or against the moving party" if there is shown to be "no genuine dispute as to any material fact." Md. Rule 2–501(f). There appears from the record to be no genuine dispute of any material fact. Thus, whether the grant of summary judgment is appropriate is entirely a question of law. *Johnson v. Mayor of Balt.*, 387 Md. 1, 5, 874 A.2d 439, 442 (2005). On appeal, the matter is reviewed *de novo* to determine if the trial court was "legally correct" in its decision. *Id.* Accordingly, the case before us turns on the interpretation of a federal statute and whether that statute preempts the Maryland law that is the basis of the complaint.

■ Courts must begin the process of statutory interpretation "with an analysis of the language of the statute." *Holland v. Big River Minerals Corp.*, 181 F.3d 597, 603 (4th

---

9. We note also that although the order entered by the court did not specify whether the court was granting Savings First's motion to dismiss or motion for summary judgment, it was stated at the conclusion of the hearing that summary judgment was being granted. This was the proper procedural action under Maryland Rule 2–322(c). *See Dual, Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 161, 857 A.2d 1095, 1100 (2004) (stating that, when factual allegations are presented beyond those alleged in the complaint, and consideration of same is not excluded expressly by the judge, the facial grant of a motion to dismiss will be treated for purposes of appellate review as the grant of summary judgment).

Cir.1999); *accord Comptroller v. Phillips*, 384 Md. 583, 591, 865 A.2d 590, 594 (2005). We must determine if the language "has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 846, 136 L.Ed.2d 808, 813 (1997); *accord Phillips*, 384 Md. at 591, 865 A.2d at 594. If the statutory language is found to be ambiguous, it is necessary to look beyond the statute itself and into the legislative history for guidance as to the intent of Congress in passing the statute. *Holland*, 181 F.3d at 603; *accord Phillips*, 384 Md. at 591, 865 A.2d at 594. In interpreting federal statutory law, a court may look beyond the plain language of a statute when: 1) Congress has expressed a clear intent contrary to the statutory text; 2) literal application would frustrate the purpose of the statute; or 3) literal application would "produce an absurd result." *Holland*, 181 F.3d at 603 n. 2.

▮ In addressing a statute enacted to preempt state law, our system of federalism has caused the Supreme Court to presume "that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700, 715 (1996). This presumption against preemption especially has been true in areas historically governed by the police power of the states, and has led to narrow interpretations of such express preemption provisions. *Id.* (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407, 423 (1992)). We adopt the view of the Supreme Court that it is our (the Court of Appeals of Maryland's) "reasoned understanding" of the statute's purpose that helps us to determine the scope of preemption; we must consider how the statute was meant to "affect business, consumers, and the law." *Medtronic*, 518 U.S. at 486, 116 S.Ct. at 2251, 135 L.Ed.2d at 716.[10] We must examine the Maryland Finder's Fee Law

---

**10.** Although not present here, even if a state statute is determined to fall outside of the scope of an express preemption, federal law nonetheless may preempt the state statute. The Supreme Court of Indiana summarized this point well in *Dow Chemical Company v. Ebling:*

against the express preemption provision of the DIDMCA, as well as the possibility that the law is preempted through conflict with federal law.

## III.

Ms. Sweeney raises three arguments in her attempt to demonstrate that the DIDMCA does not preempt the Finder's Fee Law.[11] Her first contention is that the DIDMCA pre-emption only covers aspects of covered loans affecting inter-est, and does not extend to consumer protection statutes like the Maryland Finder's Fee Law. Next, Ms. Sweeney argues that the DIDMCA only applies to purchase money loans and not to refinance mortgage loans. Finally, Ms. Sweeney ad-vances that the DIDMCA only applies to creditors. Her reasoning continues that, because Savings First is a mortgage

---

*Geier* held that even though a state law is not within the domain expressly preempted, the state law may yet be preempted if it frus-trates the purpose of the federal law or makes compliance with both impossible.

753 N.E.2d 633, 637 (Ind.2001) (citing *Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 870, 120 S.Ct. 1913, 1919, 146 L.Ed.2d 914, 924 (2000)). In *Geier,* the U.S. Supreme Court referred to this as "conflict preemption." 529 U.S. at 874, 120 S.Ct. at 1922, 146 L.Ed.2d. at 927.

**11.** A brief filed by the amici curiae in support of Ms. Sweeney raised an additional argument that Maryland took advantage of an opt out provision in the DIDMCA, which reads:

At any time after March 31, 1980, any State may adopt a provision of law placing limitations on discount points or such other charges on any loan, mortgage, credit sale, or advance described in subsection (a)(1) of this section.

12 U.S.C. § 1735f–7a (b)(4) (2000). We agree with Savings First's response that Maryland did not exercise its ability to opt out of this provision. Although the General Assembly did amend the Finder's Fee Law after 31 March 1980, the subsections relevant to the present case were left unchanged. *See* 1981 Md. Laws, Chap. 153 (amending § 12–804 to add subsection (e), barring mortgage brokers from charging finder's fees when they also act as lender in a transaction); 2000 Md. Laws, Chap. 691 (amending § 12–804 to change the language of sub-sections (b) and (e)). The legislative history of the amending bills contained information specifically acknowledging the opt out provision of the federal statute, but did not accept expressly that offer. Had it been the intent of the General Assembly to take advantage of the opt out, we believe it would have acted to do so in explicit terms.

broker, not a creditor, the Finder's Fee Law is not preempted. We shall address each of Ms. Sweeney's arguments in turn, ultimately reversing the judgment of the Circuit Court solely because the DIDMCA applies only to creditors and not to mortgage brokers. Thus, the DIDMCA preemption does not affect enforcement of the Maryland Finder's Fee Law.

### A.

The first of Ms. Sweeney's arguments that we will address is that the intended scope of the DIDMCA preemption is too narrow to cover the Maryland Finder's Fee Law. She advances the argument that the federal statute only covers state limitations on the rate or amount of interest that a lender may charge. Additionally, because the Finder's Fee Law is a consumer protection statute, Ms. Sweeney argues that it may not be preempted by the DIDMCA.

#### 1. The DIDMCA's Scope is not Limited to Interest Rates or Amounts.

The plain language of the statute states that the DIDMCA is not limited to rates and amounts of interest. The applicable language provides that any state laws "expressly limiting the rate or amount of interest, *discount points, finance charges, or other charges* ... shall not apply." 12 U.S.C. § 1735f–7a(a)(1) (2000) (emphasis added). Thus, the statute refers to, in addition to interest, two other specific types of fees or charges that are controlled by the DIDMCA. It contains also the catch-all provision of "other charges," demonstrating Congress' intent to broaden, not narrow, the scope of the statute in this regard. Ultimately, we must decide whether, all other things being equal, finder's fees, as defined by Maryland law,[12] would fall under the Federal

---

12. Maryland defines a finder's fee as "any compensation or commission directly or indirectly imposed by a broker and paid by or on behalf of the borrower for the broker's services in procuring, arranging, or otherwise assisting a borrower in obtaining a loan or advance of money." § 12–801(c).

interpretation of "discount points, finance charges, or other charges." We conclude that they would.

"Finance charge" is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a) (2000). This definition also includes finder's fees and mortgage broker fees as examples of types of charges that could be included in the determination of the finance charge. 15 U.S.C. § 1605(a)(3), (a)(6). From this codified definition, it appears as though Congress intended to include finder's fees when it enumerated "discount points, finance charges, or other charges" as items exempted under § 501(a) of the DIDMCA.

The relevant legislative history of the statute supports this conclusion. Senate Report 96–368 states that Congress intended to exempt from state regulation those items included in the annual percentage rate (APR).[13] The APR is "the actual cost of borrowing money, expressed as an annualized interest rate." BLACK'S LAW DICTIONARY 831 (8th ed.2004); 15 U.S.C. § 1606(a)(1)(A) (2000) (stating that APR is "calculated according to the actuarial method of allocating payments made on a debt between the amount financed and the amount of the finance charge"). Ms. Sweeney points out that mortgage broker fees were not added to the APR/finance charge definitions until an amendment to the Truth in Lending Act (TILA) in 1995.[14] Her argument is that because the formulation of

---

**13.** Senate Report 96–368 states that:

> In exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual percentage rate. The Committee does not intend to exempt limitations on prepayment charges, attorney fees, late charges or similar limitations designed to protect borrowers.

S. Rep. No. 96–368, at 19 (1980); *reprinted in* 1980 U.S.C.C.A.N. 236, 255.

This guideline was made an official FHLBB/OTS regulation. *See* 12 C.F.R. § 590.3(c) (2001).

**14.** The TILA is where Congress has defined "finance charge." Pub.L. 104–29 contains the following language:

(b) BORROWER–PAID MORTGAGE BROKER FEES.—

what was included in calculating the APR did not contain borrower-paid mortgage broker fees in 1980 when the DIDM-CA was enacted, Congress could not have intended to exempt those fees when it expressed its desire to exempt from state regulation fees included in the APR.

Had Congress intended to exempt only those items that were part of the APR in 1980 at the time of the DIDMCA's enactment, it could have done so by specifically stating what those items were. By using APR, a commonly known and defined term, we believe it was Congress' intent for the exemption to expand or contract necessarily with changes in the economic landscape and mortgage lending marketplace. This seems especially true considering that an amendment to the TILA was enacted at the time of the DIDMCA's passage.[15] The Senate specifically exempted the items making up the APR, knowing that the APR could, and likely would, be altered.[16]

■ The regulations of the governing federal agency appear to coincide with these conclusions.[17] Congress granted

---

(1) INCLUSION IN FINANCE CHARGE.—Section 106(a) of the Truth in Lending Act (15 U.S.C. § 1605(a)) is amended by adding at the end the following new paragraph:
"(6) Borrower-paid mortgage broker fees, including fees paid directly to the broker or the lender (for delivery to the broker) whether such fees are paid in cash or financed."
Truth in Lending Act Amendments of 1995, Pub.L. No. 104–29, § 2, 109 Stat. 271(codified at 15 U.S.C. § 1605(a)(6) (2000)).

**15.** TILA was amended to provide the consumer with clearer credit information, make credit compliance easier, limit creditor civil liability, and strengthen administrative restitution enforcement. The TILA requires creditors to disclose the true cost of credit as an APR. S.Rep. No. 96–368, at 16 (1980); *reprinted in* 1980 U.S.C.C.A.N. 236, 251–252.

**16.** In addition, as Savings First points out, a finder's fee was listed as an example of what was included in the finance charge in 1980. *See* Consumer Credit Protection Act, Pub. L. No. 90–321, § 106(a)(3), 82 Stat. 146 (1968).

**17.** Although not controlling, "an administrative agency's interpretation and application of [a] statute ... should ordinarily be given considerable weight by reviewing courts." *Bd. of Physician Quality Assurance v.*

the authority to the Federal Home Loan Bank Board (FHLBB) (now the Office of Thrift Supervision) to interpret and regulate the DIDMCA. 12 U.S.C. 1735f–7a(f) (2000). The FHLBB issued a number of regulations to help interpret and govern this area of regulation. Finance charges, as defined by the FHLBB, encompass the "cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer. . . ." 12 C.F.R. § 226.4(a) (1996). The same section states that mortgage broker fees are finance charges and finder's fees are an example of finance charges. 12 C.F.R. § 226.4(a)(3), (b)(3) (1996). Based on the interpretation of the authorized federal agency, acting in its area of expertise, finder's fees indeed would be embraced within "discount points, finance charges, or other charges."

### 2. The Finder's Fee Law is not a Consumer Protection Statute Exempted From Preemption By the Terms of the DIDMCA.

■ Congress enumerated a narrow list of consumer protection laws to which the DIDMCA would not be applicable.[18] The commonality among the items in this list is that Congress wished to allow the States to regulate or continue regulating those areas not related directly to the cost of credit. It is the cost of credit (the APR) that Congress specifically referenced immediately before stating its intent to allow state regulation of certain fees. Ms. Sweeney would prefer an interpretation of the law that would have Congress inhibiting the State's ability to regulate items encompassed by the cost of credit, while at the same time granting them broad powers to create exceptions that allow the States to enforce any kind of law designed to protect borrowers. Such an interpretation of the

---

*Banks*, 354 Md. 59, 69, 729 A.2d 376, 381 (1999) (citing *Lussier v. Md. Racing Comm'n*, 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996)).

18. See, supra n. 13, 1980 U.S.C.C.A.N. 236, 255 (listing prepayment charges, attorney fees, late charges or similar limitations designed to protect borrowers as examples of consumer protection statutes the DIDMCA would not apply to).

intent of Congress would be illogical. Ms. Sweeney relies mainly on the authority of two federal cases in making this argument.

In *Grunbeck v. Dime Sav. Bank of New York,* the U.S. Court of Appeals for the First Circuit held that a New Hampshire statute was not preempted by the DIDMCA. 74 F.3d 331, 344 (1st Cir.1996). Ms. Sweeney believes that this decision supports her contention that the Maryland Finder's Fee Law, as a "limitation designed to protect borrowers," should be exempt from preemption. In *Grunbeck,* the terms of the mortgage created a situation where the lender essentially was charging interest on interest. *Id.* at 335. This practice was illegal under New Hampshire's Simple Interest Statute (SIS) requiring that a lender charge only simple interest [19] on a first mortgage. *Id.* at 335 n. 1. Although the First Circuit did mention that the SIS afforded considerable protection to consumers, its decision was grounded on the state law not expressly limiting the rate or amount of interest. *Id.* at 340, 343–44. The case before us is distinguishable in that the Maryland Finder's Fee Law expressly *does* limit the rate or amount of the finance charge by capping the finder's fee at 8%.

The second case relied on by Ms. Sweeney also is not comparable to the case before us. That case involved a Pennsylvania consumer protection statute that prohibited the inclusion of certain non-interest charges in a home improvement loan transaction. *In re Barber,* 266 B.R. 309, 318–19 (Bankr.E.D.Pa.2001). According to the bankruptcy court, because the DIDMCA was intended *only* to preempt laws that imposed ceilings on interest rates, the Pennsylvania statute was not preempted because it prohibited non-interest charges. *Id.* at 319. The *Barber* analysis takes too narrow a view of

---

**19.** Under the New Hampshire statute, "[i]nterest may be computed either on a 360–day basis with each month containing 30 days, or on a 365–day basis with each month containing the actual number of calendar days in that particular month. Unless otherwise provided in the note, loan payments shall be applied on the scheduled payment date or on the date received." N.H.Rev.Stat. Ann. § 397–A:14(II) (1998).

the federal statute. As discussed above, the DIDMCA does not apply *only* to interest rates, but also to "discount points, finance charges, or other charges." 12 U.S.C. § 1735f–7a(a)(1) (2000). Ms. Sweeney's case would be distinguishable in any event. The charges involved in *Barber* were *non-interest* charges that come within the consumer protection provision of 12 C.F.R. § 590.3; here, the Finder's Fee Law limits fees that Congress did not intend to exempt among the enumerated list of consumer protection laws.

## B.

Next, Ms. Sweeney points out that the loans in this case were refinance mortgages, not purchase money loans, and, as a result, the DIDMCA does not apply to the pertinent transaction. In support of this contention, she relies entirely on *Mitchell v. Trs. of U.S. Mut. Real Estate Inv. Trust*, 144 Mich.App. 302, 375 N.W.2d 424 (1985). This reliance is misguided and misinterprets the holding of the Michigan appellate court.

In *Mitchell*, the court held that the DIDMCA did not preempt the Michigan usury law as it applied to the loan agreement at issue. 375 N.W.2d at 431. The state usury law in Michigan established a hard cap on interest rates at 7%. *Id.* at 427.[20] Appellants there took a second, "wraparound" [21] mortgage to pay additional debts beyond their original debt for the purchase of their home. *Id.* at 426. The lender of the wraparound mortgage admitted its loan was subordinate to the original purchase money loan,[22] and not secured by a first

---

**20.** This is similar to the Maryland Finder's Fee Law in that it is a hard percentage cap; however, it differs considerably in that the Michigan law capped the interest rate chargeable by a lender; the Maryland law caps the fee chargeable by the mortgage broker.

**21.** "A wraparound mortgage is a junior mortgage which secures a promissory note with a face amount equal to the sum of the principal balance of an existing mortgage note plus any additional funds advanced by the wraparound lender." *Mitchell*, 375 N.W.2d at 428.

**22.** As defined by the Maryland Code, a purchase money loan (or "Purchase-money obligation") is "an obligation of an obligor incurred

lien. *Id.* at 429. Although the *Mitchell* court stated in dicta that it believed § 501 of the DIDMCA should be limited to purchase money loans, it held that the state usury statute was not preempted because the loan at issue did not constitute a first lien. *Id.* at 431–32. This interpretation coincides with the plain language of the federal statute.[23]

The pertinent portion of the DIDMCA reads: "... the laws of any State expressly limiting the rate or amount of interest ... shall not apply to any loan ... which is—secured by a first lien on residential real property...." 12 U.S.C. § 1735f–7a(a)(1)(A) (2000). Congress did not intend to apply the DIDMCA preemption to every loan; Congress only preempted state laws regulating loans secured by a first lien. Although the loan in Ms. Sweeney's case was not a purchase money loan, it was secured by a first lien. Because *Mitchell's* holding is legally and factually distinguishable, Ms. Sweeney's argument, that the DIDMCA does not apply in this case because her mortgage was a refinance transaction, is unavailing.

## C.

As a final argument, Ms. Sweeney focuses on Savings First's status as a mortgage broker, rather than a lender/creditor. Ms. Sweeney claims that the intent of the statute was to grant immunity to specific parties to qualified loans from specific types of state laws. Savings First counters that the only matter of importance under the DIDMCA is that the mortgage in question meet the qualifications of the statute, thus exempting the entire transaction from regulation by state

---

as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Md.Code § 9–103(a)(2).

**23.** The plainness of the language is determined by "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Newport News Shipbuilding and Dry Dock Co. v. Brown,* 376 F.3d 245, 248 (4th Cir.2004) (quoting *Robinson, supra,* 519 U.S. at 341, 117 S.Ct. 843).

law. The relative validity and persuasiveness of this argument turns on whether Congress enacted the DIDMCA principally to regulate the actors or the transactions in the regulated field.

In order to have the DIDMCA apply, the transaction must involve a qualifying mortgage. Under § 1735f–7a(a)(1), a loan or mortgage must meet three requirements: be secured by a first lien on residential real property; be made after 31 March 1980; and be a "federally related mortgage loan" as defined by the National Housing Act (NHA).[24]

There is no dispute that Ms. Sweeney's mortgage with Concorde meets the first two requirements. For a loan to qualify as a federally related mortgage it must satisfy some part of the definition found in § 527(b) of the NHA. Savings First alleged facts indicating that Concorde was indeed a creditor under the NHA, making loans totaling over $1,000,000 annually. Ms. Sweeney did not dispute these facts. The Concorde mortgage at the center of this controversy qualifies as a "federally related mortgage." Having determined that the DIDMCA *may* apply to the mortgage because it satisfies this requirement of the statute, we must determine if it *does* apply in this case.

Savings First contends that because the transaction in question is a qualified mortgage under the DIDMCA, the Finder's Fee Law is preempted. According to it, once a loan is found to meet the requirements of the federal statute, the transaction is removed from the authority of the states to regulate. In contrast, Ms. Sweeney argues that the DIDMCA

---

**24.** A "federally related mortgage loan" is described in § 527(b) of the NHA. The portion of that section relevant to this case provides that such a loan:

> (D) is made in whole or in part by any "creditor", as defined in section 1602(f) of Title 15, who makes or invests in residential real estate loans aggregating more than $1,000,000 per year.

12 U.S.C. 1735f–5(b)(2) (2000).

The term "creditor," as defined by the U.S.Code, refers to a person who regularly extends consumer credit payable in more than four installments, and is the person to whom the debt is initially payable. 15 U.S.C. 1602(f) (2000).

preemption provision operates *only* with respect to the party acting as the creditor in a qualifying mortgage transaction. Ms. Sweeney argues that Savings First, a mortgage broker, is beyond the narrow scope of the federal law in this regard. We conclude that either party's interpretation is facially plausible from a fair reading of the plain language of 12 U.S.C. § 1735f–7a.

 A statute is ambiguous where it can be reasonably read to have either of two interpretations. *Holland,* 181 F.3d at 603 (citing *Robinson,* 519 U.S. at 342, 117 S.Ct. at 846, 136 L.Ed.2d at 814); *accord Phillips,* 384 Md. at 591, 865 A.2d at 594. Accordingly, we look to the legislative history to glean, if possible, the purpose of § 501(a) of the DIDMCA. According to the U.S. Senate Reports published at the time the DIDMCA was enacted, the economic climate of our nation at that time was very different than it is today. In contrast with today's near record low interest rates and abundance (some would say overabundance) of available credit, the late 1970's experienced skyrocketing interest rates and lenders unwilling or reluctant to lend. S.Rep. No. 96–368, at 19 (1980); *reprinted in* 1980 U.S.C.C.A.N. 236, 254. Congress determined that a lack of available mortgage funds was in part caused by states restricting interest rates to below market levels:

> The Committee finds that where state usury laws require mortgage rates below market levels of interest, mortgage funds in those states will not be readily available and those funds will flow to other states where market yields are available. This artificial disruption of funds availability not only is harmful to potential home-buyers in states with such usury laws, it also frustrates national housing policies and programs.

*Id.* In response, Congress passed the DIDMCA to restrict state usury laws in an effort to "ease the severity of the mortgage credit crunches of recent years." *Id.* at 18. "[T]he overriding objective of the act was to assist both borrowers and lenders by freeing up additional credit for housing." *Quiller v. Barclays Am./Credit, Inc.,* 764 F.2d 1400, 1403 (11th

Cir.1985) (en banc) (per curiam) (J. Hill, dissenting). Congress, it seems, was focused then on a national housing policy that would encourage lenders to lend and borrowers to borrow. Hindsight informs us today that Congress' goals in this regard have been exceeded.

There are few other sources to turn to in order to find further clarification as to who or what was intended to benefit from the preemption provision of the DIDMCA. Ms. Sweeney cites three unpublished opinion letters of the federal agency delegated the responsibility to regulate in this area, claiming support for her position that only lenders qualify as creditors. Although such commentaries are not binding on this Court, there is some guidance to be found there. Two of those letters were a response to specific questions about a lender, and offer little clarification as to the status of a mortgage broker in relation to § 501(a). The third opinion letter, however, responded to a request to interpret the regulations governing the preemption of state usury laws. 1989 WL 1114192 (O.T.S.) (Eugene M. Katz, Acting Deputy General Counsel, Office of Thrift Supervision) (1989). The agency opinion commented that the FHLBB "noted that certain lenders will be eligible for usury preemption if they are considered creditors" under the Truth in Lending Act (TILA). *Id.* (quotations removed).

One thing is certain, mortgage brokers are not included in the definition of "creditor" under the TILA.[25] A 1982 amendment to the TILA narrowed the definition of "creditor." At that time, a "person who regularly arranged for the extension of consumer credit" was removed from the definition of "creditor." Garn–St Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, § 702(a), 96 Stat. 1469, 1538 (1982). Prior to the 1982 amendment, the definition easily would have been read to include mortgage brokers as creditors, thus eliminating the question presented in the case before this Court. By removing language from the definition of "creditor" that could

---

25. *See* supra, note 24 (defining "creditor" under the TILA).

include mortgage brokers, we find that Congress intended to *eliminate* those entities from the definition.

Savings First argues that this change in definition was an effort to protect real estate brokers from any liability as creditors under the TILA. In so arguing, Savings First cites the Senate report discussing the purpose of the amendment. The report indeed does make specific reference to real estate brokers and the conflict that their inclusion in the definition of "creditor" creates with Congress' intent to simplify the TILA. S.Rep. No. 97–536, at 43 (1982); *reprinted in* 1982 U.S.C.C.A.N. 3054, 3097. Savings First seems to imply that, because of the specific reference to *real estate* brokers, Congress was not intending necessarily to limit the definition of "creditor" to remove *mortgage* brokers from its coverage. That does not appear to us to be an accurate reading of the Senate report. The report concludes its discussion on the purpose of section 702(a) of Pub.L. 97–320 with the following statement:

> [T]he Committee believes it is essential to clarify this coverage issue and prevent similar questions from arising in the future by eliminating "arrangers of credit" from the Act's coverage and thereby limiting the law's application to *actual professional extenders of credit.*

*Id.* (emphasis added). The issue of whether a mortgage broker should have been covered by the TILA certainly may be viewed as a "similar question" to that of a real estate broker's inclusion within its coverage. By limiting the law to "*actual professional extenders of credit,*" Congress foreclosed the need for that question to be addressed by the courts.

Based on our interpretation and understanding of the legislative history behind the DIDMCA, and related statutes and regulations, we conclude that Savings First, as a mortgage broker, did not qualify as a creditor regulated by the DIDMCA. We also believe the proper interpretation of the DIDMCA's preemption provision is to offer immunity from state regulation to lenders in order to promote a national housing policy, not to offer the same protections to any party to a

transaction to which a qualified lender is also party. There-
fore, Maryland's Finder's Fee Law is not preempted expressly
by federal statute on the basis that a mortgage broker is a
lender or creditor within the meaning of that statute.[26]

### IV.

The Maryland Finder's Fee Law is very narrow in its scope:
it applies only to mortgage brokers and the fees they charge
borrowers. Congress's intent in passing the DIDMCA was to
protect lenders from state regulation and promote a national
housing policy encouraging the free flow of money to borrow-
ers. Mortgage brokers are outside the reach that Congress
intended for the federal statute. For that reason, we find that
the Finder's Fee Law is not preempted by the DIDMCA. We
reverse the judgment of the Circuit Court and remand the
case for further proceedings.

JUDGMENT OF THE CIRCUIT COURT FOR FREDER-
ICK COUNTY REVERSED; CASE REMANDED TO
THAT COURT FOR FURTHER PROCEEDINGS CONSIS-
TENT WITH THIS OPINION; COSTS TO BE PAID BY
APPELLEE.

----

**26.** Neither is there conflict preemption between federal law and the
Maryland Finder's Fee Law. The limitation on finder's fees does not
frustrate the purpose of encouraging the free flow of credit. Mortgage
brokers are not required normally for consumers to procure a loan.
Lenders may, and still do, lend without the aid of mortgage brokers.